## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WHALECO INC. <br><br>                    Plaintiff, <br><br> v. <br><br> SHEIN US SERVICES, LLC, SHEIN DISTRIBUTION CORPORATION, and ROADGET BUSINESS PTE. LTD. <br><br>                    Defendants. | No. _____ <br><br><br> **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiff Whaleco Inc. ("Temu" or "Plaintiff"), by its attorneys, Boies Schiller Flexner LLP, bring this Complaint against Shein US Services, LLC, Shein Distribution Corporation, and Roadget Business Pte. Ltd. (collectively, "Shein" or "Defendants") and alleges, upon personal knowledge as to events or actions taking place in its presence, and upon information and belief as to all other events or actions, as follows:

### NATURE OF THE ACTION

1.      Temu and Shein are at the vanguard of ultra-fast fashion, where technology and highly efficient supply chains meet to satisfy consumer demand for cutting-edge fashions at ultra-low prices.  The speed of communications and rapidly changing consumer preferences and fashion have created strong consumer demand for the ultra-fast fashion business model. Critically, that model relies on relationships with tens of thousands of clothing manufacturers capable of meeting the rigors of the ultra-fast fashion business model.

2.      Temu and Shein both have extensive experience with ultra-fast fashion in Asian markets.  Shein entered the United States market in 2017 and obtained a monopoly position. Temu entered the U.S. market in September 2022.  Temu quickly became U.S. consumers' favorite ultra-fast fashion retailer, topping the app store charts and consistently offering lower prices than Shein.  An analysis of identical products that were offered on both Shein and Temu's platforms showed that the prices on Temu were usually 10-40% less than those on Shein.

3.      In response to Temu's entry and lower prices, Shein chose not to compete on the merits by offering better prices, terms, service, or quality to maintain or expand its U.S. business. Instead, Shein has undertaken a Scheme as alleged herein to protect and expand its power in the United States ultra-fast fashion market.

4.      Specifically, Shein has engaged in a campaign of threats, intimidation, false assertions of infringement, and attempts to impose baseless punitive fines and has forced exclusive dealing arrangements on clothing manufacturers.  As the dominant ultra-fast fashion retailer, Shein knows that manufacturers need Shein's volume and its access to the U.S. market and it is, therefore, able to coerce manufacturers into arrangements that force manufacturers not to do business with Temu.  The intent and effect of Shein's anticompetitive conduct is to exclude Temu so that Shein can charge higher prices to consumers while offering a smaller selection and lower quality than Shein would if it faced competition from Temu.

5.      As detailed below, Shein's conduct violates Sections 1 and 2 of the Sherman Act, the Clayton Act, as well as the Massachusetts Consumer Protection Law, and further constitutes common-law tortious interference.  Shein's Scheme harms consumers and competition by raising prices to consumers, restricting choice and innovation, and impairing the expansion of the ultra-fast fashion market in the United States.

## BACKGROUND

6.      On December 24, 2022, as the peak shopping season in the U.S. was about to take a short break to celebrate the holidays, *The Wall Street Journal* published an article dedicated to a retailer that had entered the market only three months prior.  "American Bargain Hunters Flock to a New Online Platform Forged in China" read the headline.  The byline continued, "Temu, a marketplace with deep discounts and copious coupons, has become the most downloaded app in the U.S."

7.      Temu entered the U.S. market in September 2022.  Its goal: To drastically reduce consumer prices and increase responsiveness to new fashion trends and consumer demands.

8.      On February 12, 2023–Super Bowl Sunday–Temu took out two spots to run a commercial depicting a young woman buying a number of dresses and other apparel at affordable prices and finishing with the message "shop like a billionaire" in reference to the affordability of the clothing and other items available on the app.



9.      Until Temu's launch, Shein comfortably dominated the segment of the fashion industry generally referred to as the ultra-fast fashion market in the United States.

10.     The ultra-fast fashion business distinguishes itself from fast fashion by offering not only an overwhelming number of products, but also frequently replacing those products with new designs.  Unlike high-end fashion—which is characterized by exclusivity, high prices, and slow style refreshes—ultra-fast fashion offers a huge number of ever-changing styles for extraordinarily low prices.

11.     As it announced during the Super Bowl, Temu had entered the market to provide U.S. customers with another option for affordable, quality products on its own website and mobile app (the "Temu Platform").  Temu's demonstrated ability to offer hundreds of thousands of new and frequently updated products at low prices poses a direct competitive threat to Shein.

12.     There has been quick public recognition that Temu is creating a competitive constraint on Shein.[1]

13.     Temu is better situated than any other firm to challenge Shein's dominance and deliver better consumer value.

14.     Though new to the U.S., Temu's affiliated companies are some of the most successful online retailers.  Shein is well aware that Temu has the experience and ability to identify and source from the most efficient apparel manufacturers and build an agile business model that offers an ever-evolving product line to lure customers to its platform.  Temu's entry into the U.S. market was, therefore, a disruption to Shein's easy dominance in ultra-fast fashion. As a result, Shein now views itself as being "at war" with Temu and has engaged in an elaborate

---

[1]      THE CHINA PROJECT, *Temu vs Shein: Which platform will rule the ecommerce world?* (March 17, 2023) (*available at* https://thechinaproject.com/2023/03/17/temu-vs-shein-which-platform-will-rule-the-ecommerce-world/.

and anticompetitive Scheme aimed at stymieing Temu's business.  The U.S. market is the primary theatre of this war.

15.     Faced with direct competition from another platform capable of taking on its business model, Shein retaliated with exclusionary conduct to lock up the supply chain, and directed other unlawful conduct at Temu to undermine its ability to offer similar products at prices that are consistently lower than Shein's.  Specifically, Shein has implemented at least four strategies geared toward stifling competition from Temu (collectively, the "Scheme"):

(a)     Shein forces manufacturers to enter into adhesion agreements that effectively create exclusive supplier relationships with Shein and threatens manufacturers with onerous fines and penalties if they supply product to Temu;

(b)     Shein forces manufacturers to sign loyalty oaths certifying that they will not do business with *Temu*, but which are silent as to any other competitor or potential competitor;

(c)     Shein issues public penalty notices and imposes extrajudicial fines on disobedient manufacturers for supplying product to Temu, practices that simultaneously punish manufacturers that dare to do business with Shein's closest competitor and warns other manufacturers that Shein will not tolerate any manufacturer's doing business with Temu; and

(d)     Shein sends numerous false notices of copyright infringement to Temu in order to disrupt sales of products that are offered for sale on Temu.  These notices are almost always aimed at products that Temu sells at lower prices than Shein charges for identical or similar products.

16.     By October 2022, Shein had begun engaging in all the anticompetitive conduct that forms the Scheme.  Since that time, more than 10,000 product listings have been pulled from Temu because of Shein's Scheme.

17.     Appropriate and competitive responses to a new market entrant include offering better terms, features, or prices.  Shein instead chose to engage in its anticompetitive Scheme of coerced exclusivity, threats, intimidation, and direct financial punishments.  Shein's conduct is the opposite of competing fairly and within the bounds of applicable law.

18.     Shein's conduct harms competition, and its effects are felt by the merchants it threatens and penalizes, by U.S. consumers, and by Temu's U.S. business.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337(a) (antitrust), and 15 U.S.C. § 15 (Clayton Act) because Plaintiff asserts claims for violations of the federal antitrust laws.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

20.     The Court has personal jurisdiction over each Defendant.  Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal monopolization Scheme throughout the U.S. and in this District specifically.  The anticompetitive Scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District, and throughout the United States.  The anticompetitive Scheme directly affects import commerce.

21.     Venue is proper in this District pursuant to 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. §1391(b) (general venue provision), because Defendants reside, transact business, are found, or have agents in this District.  Defendants use social media to target consumers in Massachusetts to join their platform

6

and purchase their products, and they ship consumer goods to and imports into Massachusetts.

Moreover, Shein's anticompetitive Scheme expressly targeted their most direct and significant

competitor, Temu, a corporation with its principal place of business in Boston, Massachusetts, by

sending knowingly false notices of copyright infringement to Temu in Massachusetts and

punishing manufacturers who sought to do business in Massachusetts with Temu.  As a result, a

substantial part of the interstate trade and commerce involved in and affected by the violations of

the antitrust laws was and is carried on in part within this District.  The acts complained of have

and will continue to have substantial effects in this District.

## PARTIES

22.     Plaintiff Whaleco Inc. (d/b/a Temu) is a Delaware corporation with its principal

place of business in Boston, Massachusetts.

23.     Defendant Roadget Business Pte. Ltd. is a private limited company organized

under the laws of Singapore.  Roadget Business Pte. Ltd. owns the website https://us.shein.com

and the corresponding mobile application.

24.     Defendant Shein Distribution Corporation ("Distribution Co.") is a Delaware

corporation with its principal place of business in Los Angeles, California.  Distribution Co. is an

affiliate and licensee of Roadget Business Pte. Ltd.

25.     Defendant Shein US Services, LLC is a Delaware limited liability company with

its principal place of business in Los Angeles, California.

26.     Discovery will reveal the precise responsibilities and roles of each of the Shein

entities in connection with the Scheme, but a substantial part of Scheme's conduct has occurred

in the United States.  For example, Shein job postings at the time of filing indicate that Roadget

has and seeks U.S.-based employees whose responsibilities include ensuring "that sellers

understand and adhere to SHEIN's policies and procedures."  Shein has stated that U.S.-based

Distribution Co. employees manage supplier "relationships" and Shein's "opportunity pipeline," as well as "renegotiate" contracts.

## FACTUAL ALLEGATIONS

### The Evolution of Traditional, Fast-Fashion, and Ultra-Fast Fashion Markets

27. Since the late 20th century, the increasing speed of communications and fast pace of change in fashions has led to strong consumer demand for retailers that can quickly and cheaply manufacture and distribute the latest trends. The first generation of such companies were known as "fast-fashion" companies, which created and replaced styles and stock keeping units ("SKUs") offered with new and different products—far more frequently than high-end fashion brands. The speed with which such companies make new products available in response to new trends earned this industry segment its "fast fashion" label.

28. This first generation of fast fashion was comprised of companies like Zara, H&M, Forever21, Primark, Boohoo, and GAP, with some additional niche players such as Uniqlo. These competitors were distinguishable from high-end fashion brands and the rest of the garment industry because of (a) their variety of styles, which still touched on all the latest trends; (b) their extremely short turnaround time between when a trend or style is seen at a fashion show or in celebrity media and when it hits the shelves; (c) their product offerings that changed routinely within a single season; and (d) their lower price points compared to high-end fashion brands.

29. A group of high-end—and *high cost*—fashion designers published a proposal to "rewire" the fashion industry to address what they viewed as a "problem"—fast fashion's ability to get new trends to consumers "quickly" and "cheaper." They derided fast-fashion's ability to bring style to the masses at a low cost as "disposable fast fashion." In truth, those designers were recognizing that a large and identifiable segment of consumers now demanded the unique

combination of quick response and efficient distribution that brand-name designers and high-overhead retail models could not match.

30.     Notably, fashion industry participants generally do not have any intellectual property ownership over the style of apparel they offer.  Except for trademarks, fast fashion players generally lack any intellectual property interest in any garment offered for sale.

31.     A distinct new retail approach beyond fast-fashion—called "ultra-fast fashion"—evolved over the past decade.  This new market for ultra-fast fashion consists of companies including, among others, Shein, Temu, FashionNova, Zaful, and Cider.

**Ultra-Fast Fashion Competitors Offer Significantly More Styles,
at Much Lower Price Points With Even Higher Churn and Faster Design-to-Retail Cycles**

32.     Compared to the rest of the garment industry, including the fast-fashion segment, the defining characteristics of ultra-fast fashion retailers are (a) significantly more styles or SKUs of clothing offered, (b) more frequent turnover (or "churn") of styles or SKUs (approximately 5-6,000 per week as opposed to 4-500 per week in fast fashion or once per season in high-end fashion), (c) materially lower price points, (d) quicker design-to-retail time; and (e) a direct-to-consumer model that emphasizes dispatch from at or near the point of manufacture to consumers—*i.e.*, a distribution system that keeps little-to-no inventory on hand and links manufacturers and consumers more closely than ever before keeping costs down while removing supply and distribution bottlenecks.

33.     The distinct ultra-fast fashion market has been recognized by the fashion industry, including in trade journals and fashion publications such as Business of Fashion, Fashion Week Online, and Fashion United.

34.     The unique characteristics of the ultra-fast fashion model satisfy the demands of consumers for whom trends are increasingly driven by consumer-to-consumer communications

via the internet and social media.  Unlike fast-fashion, for example, ultra-fast fashion firms such as Temu and Shein look to online trends and influencers for style inspiration, rather than imitating trends set on runways and by traditional fashion houses, as fast-fashion retailers do. Ultra-fast fashion also meets the unique demands of today's decentralized and increasingly consumer-driven trends by offering more new styles faster by more closely linking the manufacturer and the end customer than fast-fashion's relatively high-overhead model does.

35.     Because the ultra-fast fashion market does not require waiting until fashions hit the runway or premier in seasonal catalogues, competitors in the ultra-fast fashion market can focus on offering as many choices as possible, as fast as possible, at very affordable prices. Consumers who shop at ultra-fast fashion retailers might also shop at fast fashion outlets, as well as high-end fashion brands, but do not perceive the broader set of fast fashion retailers, general e-commerce retailers, or high-end fashion brands to be close enough substitutes for ultra-fast fashion purchases because the other types of apparel retailers have significantly higher prices, fewer styles, and less frequently changing styles available at any given time.

36.     Ultra-fast fashion players like Shein and Temu "avoid the need for overproduction typically associated with filling physical storefronts and [prevent] much of the waste and environmental impacts associated with running a traditional retail store."[2]  For example, for each new product sold on Temu or Shein, the initial production run can be as low as 100-200 units per SKU, compared to the thousands or tens of thousands of pieces typically produced per SKU by traditional fast fashion retailers.  Ultra-fast fashion retailers thus carry little inventory and instead produce products nearly on-demand.

---

[2]     Shein, *A Unique Business Model*, https://www.sheingroup.com/our-story/a-unique-business-model/.

37.     In other words, ultra-fast fashion innovates by taking out two middlemen that the fast-fashion industry left in place.  Ultra-fast fashion cuts out the old brand-name fashion houses that have acted as arbiters of style even for fast fashion firms.  And, ultra-fast fashion shuns the higher-overhead, lower-speed marketing, inventory, and distribution systems used by brick-and-mortar and traditional internet retailers.

38.     The unique characteristics of ultra-fast fashion requires market participants to act as e-commerce retailers, meaning all or virtually all of their sales come from online sales.  In contrast, for fast fashion companies including Zara, H&M, and Forever21 only approximately 30-35% of their sales occur online rather than in their brick-and-mortar stores.  Because ultra-fast fashion players offer a large number of styles in relatively small runs, combined with a high style churn on a daily basis, a brick-and-mortar channel with space and physical restrictions is not feasible.

39.     As a result of these efficiencies, ultra-fast fashion also offers an even lower price point than fast fashion.  This substantial price difference further delineates the ultra-fast fashion from the fast fashion markets, and satisfies the demands of ultra-fast fashion's younger, social-media trend driven consumer, who has a strong preference for maximizing their ability to chase new trends on a tight budget.

40.     Price points are a key differentiator in today's fashion marketplace.  For example, a cotton-blend t-shirt from one of the high-end fashion brands could be priced above $300 when a similar t-shirt from a fast fashion retailer like GAP is approximately $30.  Other fast fashion brands might offer a similar t-shirt at prices comparable to GAP.  Yet, t-shirts on Shein or Temu likely will be offered at less than $10.

41.     Other garment retailers, including fast fashion retailers, are not reasonable substitutes for the ultra-fast fashion outlets in part because ultra-fast fashion platforms offer significantly more new styles, and these styles change effectively on a daily basis.  For the ultra-fast fashion consumer, other options are not viable substitutes in part because of the staleness of the styles and the limited style options available.

42.     Price points also differentiate fast fashion and e-commerce retailers from the ultra-fast fashion market.  Retailers not in the ultra-fast fashion market—such as H&M, Zara, Forever21, Walmart, and Amazon—all sell at significantly higher price points than do Shein, Temu, and other ultra-fast fashion companies.  Shein's specific targeting of Temu via the Scheme alleged herein also demonstrates that Shein considers Temu its most significant (if not only) competitive threat, further demonstrating that Temu and Shein directly compete in a separate and distinct market for ultra-fast fashion.

43.     Ultra-fast fashion outlets must obtain their supply from manufacturers that possess a unique combination of capabilities and expertise.  Ultra-fast fashion manufacturers create a high volume of new products and styles, requiring fast design and rapid changeover from one product to another.  They must act as their own designers by creating their own styles, be sophisticated in e-commerce, and be able to fit into the high-speed ultra-fast fashion supply chain because, as part of doing away with the middleman, ultra-fast fashion outlets use a "manufacturer-to-consumer" model that cuts out the design house and the high-overhead retailer.  And ultra-fast fashion manufacturers must do all of this on tight margins.  As a result, the pool of actual and potential ultra-fast fashion manufacturers is significantly smaller than manufacturers capable of producing apparel for export.

44.     For all the reasons above, the relevant antitrust product market is the ultra-fast fashion market.  It is also possible to view ultra-fast fashion as a distinct antitrust "sub"-market within a market that includes the first-generation of fast-fashion retailers together with ultra-fast fashion retailers.

### Shein is the Dominant Player in the U.S. Ultra-Fast Fashion Market

45.     Among the ultra-fast fashion retailers, Shein is by far the largest competitor with more than 75% of U.S. market share in 2022.  It also has a 50% share among the combined markets of fast-fashion and ultra-fast fashion.  It sells a wide variety of products, including men's, women's, and children's apparel, in the U.S. through its website, https://us.shein.com, and its corresponding mobile app.

46.     Shein's customer base and sales have exploded since early 2020.  Its global annual revenue is estimated to have grown from around $3 billion in 2019 to around $30 billion in 2022, with approximately $9.6 billion in the United States in 2022.  In the first half of 2022, Shein's app was the most downloaded shopping app in the U.S., eclipsing Amazon, with approximately 22.4 million downloads during those six months

47.     Shein has a network of approximately 8,338 manufacturers in its ultra-fast fashion line of business.

48.     Shein did not have significant ultra-fast fashion competition in the United States until Temu's Fall 2022 entry into the ultra-fast fashion market in the United States,  whereupon Temu quickly became U.S. consumers' favorite ultra-fast fashion app.

49.     Shein offers hundreds of thousands, if not over a million, apparel SKUs on its platform.

50.     The ultra-fast fashion market is a separate antitrust market from the fast fashion market.  This is seen from the enormous difference in the market actions and activity of Shein compared to the major participants in the fast fashion market.  The products offered on the Shein Platform change frequently.  According to the trade journal Business of Fashion, Shein adds thousands of new items to its U.S. site each *day,* while fast-fashion retailers, such as H&M and Zara, add thousands of new items to their U.S. site each *year*.  Business of fashion also reports that Shein added 314,877 new items to its U.S. site over the same period that H&M added 4,414 and Zara added 6,849.

51.     Shein brings those frequently-changing products to its online-only retail store at incredibly low prices, which are significantly lower than fast fashion retailers and e-commerce retailers like Amazon.  For example, Shein sells:

- Women's t-shirts for less than $10, including some for less than $3.

- Women's dresses for $10-20, including some for less than $10.

- Women's shoes for less than $20.

52.     Shein's prices are often 60 to 70 percent lower than what Zara and H&M can offer to consumers.

53.     H&M and Zara are not a significant competitive constraint on Shein due to Shein's much larger and faster-changing product selection and its significantly lower prices.

54.     Underlying Shein's rapid commercial growth is its low cost, fast, and flexible supply chain.  Specifically, Shein's network of 8,338 independent apparel manufacturers located in China is critical to its supply chain.  Shein's website states that "Shein does not own or operate any manufacturing facilities.  Instead, [it] works with a network of third-party suppliers to manufacture products that carry the Shein brand."

55.     According to research by Professor Sheng Lu, an associate professor in Fashion and Apparel Studies at the University of Delaware, companies like Zara and H&M offer about 20,000 or 25,000 different styles of products in the market in a given year.  Shein can launch as many as 1.3 million.

56.     Although Shein has a broader product offering and lower prices than fast fashion retailers such as H&M and Zara and large e-commerce retailers such as Amazon and Walmart, Shein (like Temu) has slower shipping speeds than other online retailers.  H&M's and Zara's standard shipping speeds are 3-5 and 2-3 business days respectively.  Amazon and Walmart ship most products within two business days.  Shein's standard shipping takes an estimated 12-14 days, which contributes to lower overall costs for the sale of its goods.[3]

57.     Despite slower shipping speeds, consumers keep shopping from ultra-fast fashion providers like Shein and Temu and do not substitute to other options in sufficient number to make ultra-fast fashion unappealing.  Shein is now larger than all other fast fashion and ultra-fast fashion apparel retailers globally and in the U.S., having created a dominant position in the market for ultra-fast fashion.  Shein is dominant in the U.S. market no matter how it is defined, with a share of over 75% of ultra-fast fashion and a 50% share even if ultra-fast fashion and fast-fashion were viewed together in a single market.

58.     Amazon and Wal-Mart's online operations act as both traditional high-inventory retailers and as platforms for third-party sellers, essentially using an online retail model designed to compete directly with traditional brick-and-mortar retail operations.  By contrast, Shein and Temu add designs quickly and rely on their agreements with capable manufacturers to deliver fashion at break-neck speed.

---

[3]      https://us.shein.com/Shipping-Info-a-280.html

59.     And, unlike traditional vertically integrated fast-fashion retailers such as Forever21, Shein and Temu have left behind the old seasonal update cycle and high-price infrastructure in favor of a leaner operation and efficiency innovations that enable them to deliver even more up-to-date fashions at a fraction of the price.  Consumers demand the unique combination of features that ultra-fast fashion companies offer, and do not consider them interchangeable with traditional retailers or fast-fashion.

60.     Temu is the firm best situated to take on Shein in the U.S.  Though ultra-fast fashion is relatively new to the US, Temu and its affiliated companies have directly competed against Shein and its affiliates in non-U.S. markets.  Over that time, Temu has demonstrated that it is Shein's fiercest and most successful competitor, both in terms of manufacturer engagement and consumer satisfaction.

### Temu Enters the U.S. Ultra-Fast Fashion Market and Challenges Shein's Dominance

61.     Due to the similar product offerings, product variety, product churn, and price points, Shein considers Temu to be its closest and most direct competitor in the ultra-fast fashion market.  Temu competes with Shein by offering similar products with a high number of clothing styles and a high style-churn rate at similar prices as Shein, and Temu routinely beats Shein on price for ultra-fast fashion apparel products.

62.     The products offered on the Temu Platform include men's, women's, and children's apparel.  Like Shein, nearly all Temu's product offerings in the United States come from a network of manufacturers located in China.  Many apparel manufacturers that sell products on the Temu Platform are also suppliers of Shein, and the apparel product offerings on the Shein Platform and the Temu Platform are naturally similar as they are both geared toward staying abreast of the latest mass-fashion trends desired by consumers.  In a recent lawsuit

16

against Temu, Shein labeled Temu "a direct competitor" and said that the same suppliers "sell the same competing (and sometimes identical products) products" on both Temu and Shein.[4]

63.     Temu beats just about everyone else on price.  The apparel sold on the Temu Platform is also sold at prices substantially lower than those of H&M and Zara and other e-commerce retailers like Walmart and Amazon—and even lower than Shein's prices.  An analysis of products that were offered on both Shein and Temu's platforms showed that Temu usually beat Shein on price by 10-40%.

64.     Having controlled nearly the entire market in ultra-fast fashion in the U.S. between early 2020 and Temu's entry in late 2022, Shein was and is a monopolist.  Since Temu entered the market, Shein has attempted to maintain its monopoly by means of its anticompetitive Scheme, desperate to avoid the robust competition Temu brought to the market.

65.     The Temu Platform offers over approximately 1.7 million apparel SKUs, with approximately 5,000 new SKUs added each day, and has as high a style-churn rate as the Shein Platform.  Temu's customers and sales have grown significantly since its launch in September 2022.

66.     Shein is desperate to keep its ultra-fast fashion monopoly because it has a non-diversified business.  As much as 90% of Shein's U.S. sales are ultra-fast fashion.

67.     Temu's demonstrated ability to meet the rigors of ultra-fast fashion, which requires quickly adapting to new fashions and trends, terrifies Shein, and caused Shein to react to Temu's expansion into the U.S. market with the Scheme.

---

[4]     Complaint, *Roadget Business Pte. Ltd. v. Whaleco, Inc.*, Case: 1:22-cv-07119 (N.D. Ill. December 16, 2022 )

**Shein's Anticompetitive Response to Direct Competition from Temu**

68.     After Temu entered the U.S. market, Shein began a campaign to cut off Temu's access to the most efficient and capable suppliers which Temu needs to compete effectively against Shein.  Specifically, Shein engaged in a multi-pronged Scheme seeking to thwart Temu's success by:

> (a)     forcing manufacturers to enter into adhesion agreements that effectively create exclusive supplier relationships with Shein and threatening manufacturers that they will face liability and other punitive consequences under their contract with Shein if they supply product to Temu ("Exclusive-Dealing Agreements");

> (b)     forcing manufacturers to sign loyalty oaths, which Shein calls "supplier statements," under which the manufacturers expressly agree not to work with *Temu*, but which are silent as to any other competitor or potential competitor ("Loyalty Certifications");

> (c)     issuing public penalty notices and imposing extrajudicial fines on disobedient manufacturers for supplying product to Temu, practices that simultaneously punish manufacturers that dare to do business with Shein's closest competitor and warns other manufacturers that Shein will not tolerate any manufacturer's doing business with Temu ("Penalty Notices"); and

> (d)     sending thousands of errant notices of copyright infringement to Temu in order to disrupt sales of products offered for sale on Temu.  These notices

18

are almost always aimed at products that Temu sells at lower prices than

Shein charges for identical or similar products ("Takedown Notices").

69.    As of May 2023, Shein has required all of the approximately 8,338 manufacturers supplying or selling on the Shein Platform to execute Exclusive-Dealing Agreements, which prevent those manufacturers from offering products on the Temu Platform or supplying products to sellers on the Temu Platform.

70.    The approximately 8,338 manufacturers that supply Shein represent 70-80% of the total number of merchants capable of supplying ultra-fast fashion.

71.    Shein actively enforces these Exclusive-Dealing Agreements against the manufacturers who created the product designs and produced the product pictures and videos for offering the same products for sale on the Temu Platform.  Temu is not aware of Shein enforcing these Exclusive-Dealing Agreements against manufacturers offering similar products for sale on platforms other than Temu.

72.    As noted above, Shein does have some sales outside ultra-fast fashion.  Upon information and belief, Shein does not demand or impose exclusivity on non-ultra-fast fashion manufacturers.

73.    One women's apparel manufacturer told Temu that Shein's management was directed to "go after" manufacturers that do business with Temu.  That manufacturer, and the 300 SKUs it sold on Temu, left Temu in November 2022.  Consistent with that manufacturer's report of a management directive to target merchants that sell on Temu, that manufacturer's departure and blaming of Shein coincides with the departures and statements of several other major ultra-fast fashion manufacturers.  Some apparel manufacturers have asked Temu to remove all of their products offered for sale on Temu's platform in order to appease Shein.

74.     Other manufacturers have systematically removed from Temu all products that they sell on both Temu and Shein's websites, and have refused to offer new products on Temu. For instance, a manufacturer with 500,000-600,000 ultra-fast fashion unit sales per month began removing SKUs from Temu in October 2022 and stopped doing business with Temu entirely in early 2023 as a direct result of Shein's exclusivity demands, as well as its threats and intimidation.

75.     Shein exerts its dominant position to force the manufacturers to agree to commercially unreasonable terms in the Exclusive-Dealing Agreements, including terms that grant Shein the exclusive ability to publish, display, or otherwise use the manufacturer's products and style design.

76.     In addition, Shein uses its dominant position to force manufacturers to agree to provisions in the Exclusive-Dealing Agreements that purportedly assign all of the manufacturer's claimed rights, powers, and interests related to product pictures and videos supplied to Shein regardless of whether Shein uses such photos and videos.  The Exclusive-Dealing Agreements do not require Shein to pay any license fees or transfer fees in order to own these rights.  Upon information and belief, no written assignment beyond the four corners of the Exclusive-Dealing Agreements is ever executed.  Thus, the so-called assignments are invalid—and Shein knows it.

77.     The Exclusive-Dealing Agreements that Shein imposes are inconsistent with industry practice, and it is only through Shein's exercise of its market or monopoly power that it can coerce manufacturers to agree to those Agreements' exclusionary terms.

78.     Under the Exclusive-Dealing Agreements, Shein threatens and demands from manufacturers who do business with Temu penalty fees of 3,000 yuan (approximately $45) per design, picture, or video, or the alleged financial loss (whichever is higher) *in addition to* what

Shein falsely calls income purportedly lost by Shein (but which is, in fact, a punitive requirement that the manufacturer pay Shein the full sales price, including Temu's commission).

79.     Shein's practice is to threaten manufacturers with these penalties when Shein finds products on the Temu Platform that bear some resemblance to products on the Shein Platform.  This makes it clear to Shein's manufacturers that doing business on Temu is off limits.

80.     Specifically, Shein informs the "offending" manufacturer when it has identified "that such products *or highly similar products* (hereinafter referred to as "infringing products") and related product images appeared on the website www.temu.com."

81.     Shein has no legitimate intellectual property interest in these allegedly "infringing products."  Shein knows that there is no Shein ownership of these "infringing products."  Its assertions of "infringement" are objectively baseless and serve no purpose other than to enforce anticompetitive exclusivity for Shein, making it impossible or impracticable for manufacturers to do business with Temu.

82.     Shein also demands that any "offending" manufacturer execute a Loyalty Certification.  These Certifications misleadingly use the capitalized term "Infringing Products," which is defined—contrary to both reason and law—to mean any product sold on Temu that is "highly similar" to any product sold on Shein.  The Certifications then recite a lengthy loyalty oath in which the manufacturer must affirm, among other things, that:

> (a)     it has "never cooperated with Temu in the production and sales of Infringing Products,"
>
> (b)     "Neither the Infringing Products displayed and sold on the Temu website nor their images were provided to Temu by the Supplier,"

    (c)    "the Infringing Products and their images on the Temu website have violated the legitimate rights and interests" of Shein.

83.    Thus, like the Exclusive-Dealing Agreements, the Loyalty Certifications go beyond the scope of Shein's falsely claimed IP rights by purporting to prohibit manufacturers from working with Temu.

84.    According to at least one manufacturer, it is not possible to "appeal" Shein's unilateral determination of whether a product is "highly similar."

85.    After Shein decides a "highly similar" product has been offered on Temu's website, it publishes a Penalty Notice to its manufacturer portal.  These Notices appear as pop-up window alerts that go to all Shein manufacturers, so that all manufacturers are reminded that Shein polices its Exclusive-Dealing Agreements and punishes any merchant that falls out of line. That is, the Notices name and shame manufacturers that have violated Shein's exclusivity demands, and they serve as a public warning to all manufacturers not to sell on Temu, which has a chilling effect on the relevant market.

86.    At least one manufacturer reports that Shein placed Shein employees on their factory floor to ensure that the manufacturer did not produce any products that were sold on Temu.

87.    Shein aggressively enforces the terms of the Exclusive-Dealing Agreements and Loyalty Certifications by imposing extrajudicial fines on suppliers alleged to be in violation. These penalties and fines serve no legitimate purpose except to punish manufacturers for doing business with Temu.

88.    These fines and additional overhead costs are prohibitive for low cost, ultra-fast fashion manufacturers.  For each product a manufacturer seeks to sell on the Temu or Shein

Platforms, the manufacturer, not Shein, must invest in the development of the design and the cost of preparing professional photos of the products for posting on the platforms which can be $400-$500.  In light of the high rate of churn with which ultra-fast fashion players add new designs and products, this cost has a material impact.  A benefit to manufacturers of operating on both Temu and Shein Platforms is that it can create incremental increases to its profit margins by leveraging the same product design and imagery used for one platform on the other.  As one manufacturer explained that "98% of [the] products are Shein top selling items" that it tries "to give to [Temu] at the same time."

89.     The profit margins in this sector are very small for manufacturers, who rely on making a wide variety of products and styles.  This combination of a large volume of different product styles and low margins makes ultra-fast fashion manufacturers especially susceptible to coercion by Shein because such manufacturers must constantly introduce new, low-priced products.  Thus, ultra-fast fashion manufacturers cannot rely on increasing volume of previous designs to expand revenue.  Nor can they simply increase their margins because ultra-fast fashion consumers demand ultra-low prices.

90.     For example, the cost of additional photosets are material and, combined with Shein's threat of penalties, may make it unprofitable to sell a product on both Shein and Temu.  As a result, Shein's effort to force manufacturers to incur the cost of preparing creative materials *again* for each channel it sells on and imposing fines for so-called "violations" of its Agreements and Certifications are prohibitive for manufactures.  These tactics create *de facto* exclusivity in light of the high churn of new styles and razor-thin profit margin for manufacturers in these product categories.  Whatever incremental increase in profit margin a manufacturer may hope to

achieve by also selling on the Temu Platform is evaporated by Shein's fines and cost-prohibitive demands.

91.     In sum, rather than compete on the merits by offering manufacturers better terms or better service than Temu to win their exclusive business, Shein uses its monopoly power to make it uneconomical, and therefore impossible as a practical matter, to sell via Temu.

92.     Similarly, the Chinese manufacturers on whom Temu and Shein rely are not familiar with the U.S. legal system and lack the funds to pursue independent advice in response to Shein's objectively baseless legal threats and claims of "infringement."

93.     The Exclusive-Dealing Agreements, Loyalty Certifications, Penalty Notices, fines, and threatened litigation have served Shein's intended purpose.  Shein has effectively imposed exclusivity on manufacturers.  Manufacturers have reported concerns about working with Temu because of the threat of retaliation by Shein.

94.     One manufacturer reported being "worried because we also have an agreement with Shein," noting that "if Shein sues [them], it'll be very embarrassing."

95.     Another manufacturer wrote to Temu after posting products on Temu's Platform, explaining its decision to take down the Temu postings:  "Shein is going to pursue liability and give us a fine" of "100,000" RMB ($15,000.00 (USD)).

96.     If the fines and other consequences described above do not stop a manufacturer from doing business with Temu, Shein will limit or stop a manufacturer's ability to upload new products or terminate the manufacturer.

97.      Shein's market power as the dominant retail platform in the ultra-fast fashion market has made its Scheme effective.  Because of this market power, manufacturers of apparel products are coerced into signing Exclusive-Dealing Agreements and Loyalty Certifications,

despite the fact that those agreements are anticompetitive and against the best interests of both manufacturers and consumers.

98.     The Shein Exclusive-Dealing Agreements, Penalty Notices and fines, Loyalty Certifications, and threatened litigation have no pro-competitive purpose or effect.

99.     Shein enforces the terms of the Exclusive-Dealing Agreements and forces suppliers to sign Loyalty Certifications.

100.     But for the Exclusive-Dealing Agreements and their enforcement, Temu would move as much as 3x-4x the volume of ultra-fast fashion merchandise it currently moves daily.  In other words, the Exclusive-Dealing Agreements are suppressing Temu's ultra-fast fashion sales volume by 300-400%.

101.     In short, the Exclusive-Dealing Agreements' and Loyalty Certifications' de facto prohibition is on Temu alone, and not on any other retail platforms.  The unlawful acts hinder Temu's ability to compete with Shein in the ultra-fast fashion market.

### Shein's Conduct Hinders Temu's Ability to Compete, Resulting in Higher Prices, Less Selection, and Poorer Quality for Consumers.

102.     The Scheme denies U.S. consumers access to direct price competition between Shein and Temu.  As noted above, Temu regularly beats Shein on price for identical products. The Scheme's most immediate effect on U.S. consumers has been to eliminate their ability to comparison shop for the same or similar products across Temu and Shein's Platforms.

103.     The Scheme has also hampered Temu's growth in the U.S. market, and has allowed Shein to continue to hold its monopoly position.  But for the Scheme, Temu's market share would be substantially higher and Shein would no longer hold a monopoly position in the U.S. market.

104.    Critically, the Scheme has foreclosed Temu's access to the manufacturers capable of successfully executing the ultra-fast fashion business model.  This model requires a combination of an ability to thrive by creating numerous designs and SKUs, then bringing them to market rapidly and on low margins.  Ultra-fast fashion manufacturers must be able to quickly shift production to new SKUs; they cannot rely on a high volume of a single production run or SKU.  They must also be sophisticated in e-commerce and have the expertise and facilities necessary to fit into the efficient logistics and distribution practices necessary to deliver ultra-fast fashion.

105.    Without access to manufacturers capable of working within the ultra-fast fashion model, retail platforms are unable to compete with Shein in the ultra-fast fashion market in terms of price, product selection, or product quality.  Shein is attempting to foreclose Temu from this critical input by requiring and enforcing the Exclusive-Dealing Agreements and Loyalty Certifications, and publicly shaming, imposing fines on, and threatening litigation against suppliers suspected of supplying Temu.

106.    Shein is supplied by most of the manufacturers that are capable of manufacturing ultra-fast fashion apparel at the low costs and with the speed necessary for a retail platform to effectively compete in the ultra-fast fashion market.  These manufacturers account for the majority of the suppliers that can efficiently supply the U.S. ultra-fast fashion market.  As a result, Shein's Scheme forecloses Temu from this critical input.

107.    The harm caused by Shein's anticompetitive conduct impacts both Temu and U.S. consumers.  The Exclusive-Dealing Agreements hinder Temu's ability to offer prices or selection that are competitive with the Shein Platform, which in turn results in anticompetitive

harm for consumers—higher prices, less selection, and poorer quality than that which would prevail with competition.

**Shein Threatens Temu to Take Down Competitive Products**

108.    Shein has engaged in a series of actions in which it has misused U.S. intellectual property laws in order to threaten Temu to take down competitive products from the Temu Platform, frequently in cases in which Temu is offering a product identical or similar to a product offered on the Shein Platform, but at a lower price.

109.    Beginning on September 14, 2022, Shein began a coordinated campaign of serving Temu with a large number of "takedown notices" containing thousands of product listings that purport to comply with the requirements of the Digital Millennium Copyright Act (DMCA) (the "Takedown Notices"), 17 U.S.C. § 512 *et seq*., in response to efforts by suppliers who are selling products on the Shein Platform to also offer products for sale (at consistently lower prices) on the Temu Platform.

110.    In the majority of instances, Shein's demands have targeted products that are offered on Temu at a lower price than the price Shein has for an identical or a comparable product.

111.    In each Takedown Notice that it has served on Temu's Delaware-based agent, Shein has made the following false statement:  "I hereby state that I have a good faith belief that the disputed use of the copyrighted material identified above is not authorized by the copyright owner, its exclusive licensee, its agent or under the law."

112.    The Exclusive-Dealing Agreements do not create effective assignments or valid exclusive licenses to the supplier's copyrights in the photo and video works that they created to promote the goods that they have manufactured and attempted to sell on both the Shein and Temu Platforms because, *inter alia*, they fail to meet the requirements of 17 U.S.C. § 204.

113.    In fact, manufacturers have repeatedly claimed ownership of the product display images, contesting Shein's assertions to the contrary.

114.    The Exclusive-Dealing Agreements do not create assignments or effective exclusive licenses to the supplier's copyrights in the photo and video works that the suppliers created to promote the goods that they have manufactured and are attempting to sell on both the Shein and Temu Platforms because, *inter alia*, they are unenforceable contracts of adhesion.

115.    The Exclusive-Dealing Agreements do not effectuate an assignment of copyrights because, *inter alia*, they do not contain language of present assignment.

116.    Upon information and belief, Shein and its suppliers have not executed separate assignments other than the Exclusive-Dealing Agreements for any supplier's copyrights in the photo and video works that they created to promote the goods that they have manufactured and are attempting to sell on both the Shein and Temu Platforms.

117.    Contrary to Shein's repeated false assertions to Temu's Delaware-based DMCA agent that Shein has "a good faith belief that the disputed use of the copyrighted material identified above is not authorized by the copyright owner," in each instance the use of photos or videos by manufacturers on the Temu Platform is authorized by the copyright owners because the manufacturers are the creators of the product display images and are the lawful owners of the copyrights.  To wit, the manufacturers just want to be able to sell their goods on the Temu Platform while supplying Shein at the same time.

118.    Upon information and belief, Shein has directed its false Takedown Notices, exclusively when its suppliers attempt to sell the same or similar goods on the Temu Platform. For example, Shein has served dozens of Takedown Notices on Temu in an attempt to prevent a supplier from selling goods on the Temu Platform.

119.    Shein has also made false statements to the United States Copyright Office to secure and to attempt to secure copyright registrations to use to prevent suppliers from selling goods on the Temu Platform.  For example, Shein has falsely stated to the United States Copyright Office that the photographs that suppliers have provided to Shein at the suppliers' expense are "works for hire."

### Shein Has Market or Monopoly Power in the Ultra-Fast Fashion Market

120.    Ultra-fast fashion is a relevant market for antitrust analysis.  The ultra-fast fashion market consists of retailers that offer the unique combination of fast response to new trends and ultra-low prices as alleged above.  The incredibly fast rise of Shein's sales is evidence of a separate market for stylish, fast-churn apparel at ultra-low prices.  Although fast fashion retailers and general online retailers offer stylish apparel at low prices, ultra-fast fashion retailers have unique characteristics, including prices that are substantially lower, product selection that is substantially larger, more frequent product changes, less inventory, and slower delivery speed than those of fast fashion retailers and general e-commerce retailers.

121.    Due to these substantial differences in price, selection and churn, fast fashion and general e-commerce retailers are not reasonable substitutes for, and not functionally interchangeable with, ultra-fast fashion retailers.

122.    Consumers and industry participants, including trade journals and Shein itself, recognize ultra-fast fashion as a distinct market or "sub"-market of fast-fashion.

123.    Temu is unaware of Shein targeting companies other than Temu, such as H&M.  Shein thus acknowledges by its own actions that ultra-fast fashion is the relevant product market for analyzing Shein's conduct.

124.     In response to a small but significant and non-transitory increase of the price of ultra-fast fashion apparel, U.S. customers would not meaningfully switch to fast fashion retailers' or to other e-commerce retailers' products.

125.     Shein's ability to extract unreasonable and highly unusual terms, such as the Temu-specific Loyalty Certifications and Exclusive-Dealing Agreements, further demonstrates its actual ability to control competition.

126.     There is a relevant geographic market for ultra-fast fashion limited to the U.S. The Shein and Temu Platforms are both offered in U.S.-specific versions, and are marketed and shipped to U.S. consumers.  As demonstrated by the rapid uptake of Temu upon the release of its App in late 2022, U.S. consumers consider these U.S.-specific outlets as distinct from, for example, the Chinese-language outlets that do not cater to U.S. consumers' language, culture, and tastes.

127.     From at least the time of Temu's market debut through the present, Shein possessed monopoly power in the ultra-fast fashion market in the U.S.  Its share of U.S. ultra-fast fashion apparel during that period has approached 80%.

128.     Significant and substantial commercial, logistical, know how, technical, and other barriers insulate the ultra-fast fashion market from new entry and expansion.  Temu is uniquely suited to enter and challenge Shein's pricing, variety, and product quality in the U.S.

129.     The unlawful actions described in this Complaint were committed by Shein for the purpose of maintaining and increasing Shein's monopoly power in the ultra-fast fashion market.  Shein's market dominance will continue to grow if Shein is allowed to continue its Scheme, which effectively prevents apparel manufacturers from working with Temu and substantially forecloses the ultra-fast fashion market from Temu's robust competition.

130.    In the alternative, there is a relevant antitrust market that includes both fast fashion and ultra-fast fashion.  As of November 2022, Shein had a durable 50% share of apparel sales in such a market.

## CLAIM I
## (MONOPOLIZATION IN VIOLATION OF SECTION 2
## OF THE SHERMAN ACT, 15 U.S.C. § 2)

131.    Temu incorporates the allegations of paragraphs 1 through 130 as if fully set forth herein.

132.    Shein possesses monopoly power in the relevant market(s).

133.    Shein has willfully maintained that power by engaging in the anticompetitive and exclusionary Scheme alleged herein.

134.    Shein's maintenance of its monopoly power is not a consequence of a superior product, business acumen, or historical accident.

135.    There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

136.    Shein's Scheme, and each of the constituent acts in that Scheme, constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

137.    Shein's anticompetitive conduct has affected a substantial portion of interstate commerce.

138.    Temu has suffered competitive injury in the relevant market(s) and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

139.    Shein's anticompetitive conduct has caused Temu actual damages.

140.     Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM II
## (ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2)

141.     Temu incorporates the allegations of paragraphs 1 through 130 as if fully set forth herein.

142.     Shein has attempted, continues to attempt, and specifically intends to monopolize the relevant market(s) by engaging in the anticompetitive and exclusionary Scheme alleged herein.

143.     Shein possesses sufficient power in the relevant market(s) such that it has a dangerous probability of success of monopolizing the relevant market(s).

144.     There are no procompetitive justifications for Shein's anticompetitive conduct.

145.     Shein's Scheme, and each of the constituent acts in that Scheme, constitutes an attempt violation under Section 2 of the Sherman Act, 15 U.S.C. § 2.

146.     Shein's anticompetitive conduct has affected a substantial portion of interstate commerce.

147.     Temu has suffered competitive injury in the relevant market(s) and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

148.     Shein's anticompetitive conduct has caused Temu actual damages.

149.     Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM III
## (VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14)

150.     Temu incorporates the allegations of paragraphs 1 through 130 as if fully set forth herein.

151.     Shein possesses sufficient market power in the relevant market(s) such that its Scheme has substantially lessened competition or tended to create a monopoly in the relevant market(s).

152.     Shein's Scheme and its constituent acts, including specifically its Exclusive-Dealing Agreements and Loyalty Certifications, constitute anticompetitive exclusive dealing in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

153.     There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

154.     Shein's Scheme, and each of the constituent acts in that Scheme, constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

155.     Shein's anticompetitive conduct has affected a substantial portion of interstate commerce.

156.     Temu has suffered competitive injury in the relevant market(s) and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

157.     Shein's anticompetitive conduct has caused Temu actual damages.

158.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM IV
## (VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1)

159.    Temu incorporates the allegations of paragraphs 1 through 130 as if fully set forth herein.

160.    Shein's Exclusive-Dealing Agreements and Loyalty Certifications are coerced agreements that Shein forces on manufacturers, are anticompetitive, and unreasonably restrain trade in the relevant market(s).

161.    Shein's anticompetitive agreements have affected a substantial portion of interstate commerce.

162.    Shein's anticompetitive conduct has affected a substantial portion of interstate commerce.

163.    Temu has suffered competitive injury in the relevant market(s) and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

164.    Shein's anticompetitive conduct has caused Temu actual damages.

165.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM V
## (CHAPTER 93A OF THE MASSACHUSETTS GENERAL LAWS)

166.    Temu incorporates the allegations of paragraphs 1 through 130 as if fully set forth herein.

167.    Shein's conduct is knowingly and willfully directed to harm Temu, the U.S. headquarters of which is based in Massachusetts.

168.    Shein's conduct was, among other things, an antitrust violation based on unlawful agreements in restraint of trade, monopolization or attempted monopolization, and exclusive dealing in violation of the United States Code as set forth above.  For these reasons, among others, Shein's conduct was knowingly unfair and deceptive, injurious to the public, and an unfair method of competition in violation of Chapter 93A.

169.    Shein's unfair and illegal conduct caused actual damage to Temu in the form of lost sales and profits.

170.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM VI
## (TORTIOUS INTERFERENCE WITH CONTRACT)

171.    Temu incorporates the allegations of paragraphs 1 through 130 as if fully set forth herein.

172.    Temu has existing contracts with thousands of manufacturers that also do business with Shein.  Each of these contracts affords Temu existing or prospective legal rights.

173.    Shein wrongfully, and without justification or privilege, intentionally interfered with Temu's aforementioned existing contracts through anticompetitive, wrongful, and

35

unjustifiable means of interference in order to disrupt Temu's business and gain an unfair and unjustified advantage over Temu.

174.    At the time of its actions, Shein had actual knowledge of the relevant contracts.

175.    Shein's conduct has caused, and will cause, actual damage to Temu.

176.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM VII
## (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS)

177.    Temu incorporates the allegations of paragraphs 1 through 130 as if fully set forth herein.

178.    Temu has existing or prospective business relations with thousands of manufacturers that also do business with Shein.

179.    Shein wrongfully, and without justification or privilege, intentionally interfered with Temu's existing contracts through the anticompetitive, wrongful, and unjustifiable means of interference alleged herein.

180.    At the time of its actions, Shein had actual knowledge of the relevant prospective business relationships.

181.    Shein cannot justify its actions as legitimate competition.

182.    Shein conduct has caused, and will cause, actual damage to Temu.

183.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## PRAYER FOR RELIEF

184.    WHEREFORE, Temu respectfully requests relief and judgment as follows:

(a)    declaring, ordering, and adjudging that the conduct challenged herein unreasonably restrained trade, monopolized or attempted to monopolize one or more markets, or otherwise violated the Sherman and or Clayton Antitrust Acts and, further, that it was illegal and tortious under Massachusetts State law;

(b)    permanently enjoining Shein (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the Agreements and Statements and/or any other any other similar agreements or arrangements that Shein obtained by virtue of the conduct challenged here;

(c)    awarding Temu its full monetary damages to be proven at trial;

(d)    awarding Temu treble monetary damages, pursuant to 15 U.S.C. § 15;

(e)    awarding Temu pre- and post-judgment interest on its damages;

(f)    awarding Temu treble, double, or actual monetary damages pursuant to Chapter 93A, Section 11 of the Massachusetts General Laws;

(g)    awarding Temu the costs of this action and attorneys' fees pursuant to 15 U.S.C. § 15 and Chapter 93A, Section 11 of the Massachusetts General Laws; and

(h)    awarding Temu such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. Civ. P. 38, Temu hereby demands a trial by jury on all issues so triable.

Date: July 14, 2023

*Submitted by the attorneys for the
Plaintiff Whaleco, Inc.*


/s/ Edward F. Haber
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO# 215620)
One Boston Place, Suite 2600
Boston, MA 02108
(617) 439-3939
(617) 439-0134
ehaber@shulaw.com


BOIES SCHIILLER FLEXNER LLP
Philip C. Korologos
*(pro hac vice forthcoming)*
55 Hudson Yards
20th Floor
New York, NY 10001
(212) 446-2300
(212) 446-2350 (fax)
pkorologos@bsfllp.com

James P. Denvir
*(pro hac vice forthcoming)*
1401 New York Ave, NW
Washington, DC 20005
(202) 237-2727
(202) 237-6131 (fax)
jdenvir@bsfllp.com

Sean P. Rodriguez
*(pro hac vice forthcoming)*
44 Montgomery Street
41st Floor
San Francisco, CA 94104
(415) 293-6800
(415) 293-6899 (fax)
srodriguez@bsfllp.com