# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| WHALECO INC., | |
| Plaintiff, | Case No. 1:23-cv-11596 (DJC) |
| v. | **FIRST AMENDED COMPLAINT** |
| SHEIN US SERVICES, LLC, SHEIN DISTRIBUTION CORPORATION, and ROADGET BUSINESS PTE. LTD., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 5

THE PARTIES ...................................................................................................................... 6

FACTUAL ALLEGATIONS ............................................................................................... 7

I.    Shein Has Monopoly or Market Power in the U.S. Ultra-Fast Fashion Market ............ 7

    A.    Historical and Environmental Conditions That Led to the Emergence of the Ultra-Fast Fashion Industry ............................................................................... 7

    B.    Ultra-Fast Fashion Is Different in Kind from Fast Fashion Due to Its Design-to-Retail Cycle, Minimum Order Size, Styles, and Price Points ....................... 8

    C.    The Linchpin of Ultra-Fast Fashion:  Uniquely Skilled, Specialized Suppliers and Technical Workers .................................................................................... 15

    D.    Shein Is the Dominant Player in the U.S. Ultra-Fast Fashion Market and Continues to Entrench Its Monopoly ............................................................... 17

II.   Temu's Entrance into the U.S. Market Posed a Grave Threat to Shein's Dominance 18

III.  In Response to Temu's U.S. Entry, Shein Commenced an Anticompetitive Scheme Targeting Temu in Order to Preserve Shein's Monopoly Position ............................. 19

    A.    Shein Has Coerced Suppliers Through Exclusive-Dealing Agreements, Pricing Floor Requirements, Loyalty Attestations, Threats, and Intimidation to Lock Up Supply for the U.S. Ultra-Fast Fashion Market ....................................... 20

        1.    Shein Has Coerced Suppliers into Entering Exclusive-Dealing Agreements and Tightened Its Exclusive Terms Step-by-Step to Hinder Temu's Entry ...................................................................................... 20

        2.    Shein's Agreements with Suppliers Contain Anticompetitive Pricing Floor Requirements .................................................................................. 23

        3.    Shein Has Forced Suppliers to Sign Loyalty Attestations and Engaged in Mafia-Like Coercive Management Tactics to Further Lock Up Supply ............................................................................................... 25

            (A)    Shein Has Forced Suppliers to Sign Loyalty Attestations That They Did Not and Will Not Cooperate with Temu .................. 25

            (B)    Shein Threatened Suppliers That It Would "Go After" Anyone That Supplied Temu or Any Other Third Party ...................... 27

            (C)    Shein Has Used Public Penalty Notices to Publicly Shame Suppliers Who Did Business with Temu and to Intimidate Other Suppliers from Considering the Possibility .................. 28

        4.    Shein's Enforcement Campaign Far Exceeds Its Rights Under Its Contracts with Suppliers .................................................................... 29

            (A)    Shein Has Imposed Exclusivity on Suppliers in Ways Beyond the Written Terms of the Exclusive-Dealing Agreements ....... 29

(B)     Shein Can Offer No Procompetitive Justification for Its
        Misconduct...........................................................................................30

B.     Under the Guise of IP Enforcement, Shein Has Mounted a Campaign to Lock
       Up Supply in Ultra-Fast Fashion and to Hinder Temu's Entry ......................32

       1.     Shein's True Objective Has Never Been Enforcing IP Rights, But
              Excluding Competition ........................................................................32

       2.     Shein Has Forced Suppliers to Transfer Away Their IP Rights and
              Then Improperly Used Those Rights to Exclude Competition from
              Temu ...................................................................................................35

       3.     This Antitrust Litigation Addresses a Separate Set of Conduct than the
              Illinois Copyright Infringement Litigation That Shein Has
              Mischaracterized in This Court............................................................36

IV. Shein's Multi-Faceted Anticompetitive Scheme Has Foreclosed Temu from
    Competing in the U.S. Market ...............................................................................37

V.  Shein's Multi-Faceted Anticompetitive Scheme Has Harmed Consumers, Suppliers,
    and Competition as a Whole by Increasing Prices, Reducing Quality, and Limiting
    Consumer Choice...................................................................................................38

CLAIMS ...............................................................................................................................40

PRAYER FOR RELIEF .......................................................................................................45

After Whaleco Inc. ("Temu" or "Plaintiff") filed its Complaint in this action, additional facts have come to light further revealing Shein's illegal scheme (the "Scheme") to prevent competition from Temu and entrench Shein's monopoly power in the U.S. ultra-fast fashion market. Shein is choking suppliers, harming consumers and the competitive process, and engaging in the worst forms of monopoly abuse.

Recently obtained facts, together with the facts alleged in Plaintiff's original Complaint, confirm that Shein US Services, LLC, Shein Distribution Corporation, and Roadget Business Pte. Ltd. (together, "Shein" or "Defendants") are engaging in a coordinated, multi-faceted Scheme to lock up supply available for the U.S. ultra-fast fashion industry by (1) coercing ultra-fast fashion suppliers (*i.e.*, the suppliers who manufacture the apparel) into exclusive-dealing agreements, (2) forcing suppliers to swear loyalty attestations containing false recitations that wrongly accuse Temu of wrongdoing, (3) engaging in a punitive campaign of intimidation, threats, fines, and naming-and-shaming tactics against suppliers who do business with Temu, (4) coercing ultra-fast fashion suppliers into transfers of intellectual property rights to Shein well beyond the terms and legitimate scope of Shein's agreements with suppliers, (5) enforcing Shein's exclusive-dealing agreements in the disguise of IP enforcement, burying Temu in sham copyright infringement threats based on false representations or non-existent, unenforceable, or fraudulently obtained rights, and (6) taking advantage of the reduction in competition by punishing consumers with higher prices, fewer options, and less innovation.

Accordingly, upon personal knowledge as to events or actions taking place in its presence, and upon information and belief as to all other events or actions, Plaintiff hereby alleges as follows:

## INTRODUCTION

1.      Shein is abusing its monopoly power in the U.S. ultra-fast fashion market to prevent competition, to coerce and intimidate suppliers, and to harm consumers. When Temu

entered the U.S. ultra-fast fashion market in 2022, it posed the first real threat to Shein's dominance. Shein is a reseller that buys trendy products designed by others and sells them under a Shein label. Temu offers U.S. consumers a platform showcasing a broader array of ultra-fast fashion products with better user engagement and lower prices than Shein offers.

2.    Temu's superior offering and initial success in the U.S. market were a threat to Shein, which suddenly faced the risk that its inferior service would be exposed and that it would lose its monopoly position. But instead of competing with Temu on the merits—such as by offering lower prices, more options, better service, or enhanced quality—Shein responded to Temu's competition by subverting the competitive process and orchestrating a multi-faceted anticompetitive Scheme to foreclose Temu's access to supply and to entrench Shein's monopoly position.

3.    Ultra-fast fashion is a new and unique market, evolving in response to the surging consumer demand for affordable, diversified, and almost instantaneous access to apparel of the newest trends that even established retailers, including those in the "fast fashion" business, will not match.

4.    Ultra-fast fashion leverages the latest innovations that significantly expedite the design-to-production time and reduce the minimum order size required for a manufacturer to create a new item. This agility, combined with a direct-to-consumer approach that utilizes Internet-based sales channels, efficient fulfillment centers, and air freight shipment, enables this unique industry to release thousands of styles in a week, or even in a day, and to swiftly deliver parcels to consumers in the United States and worldwide.

5.    Ultra-fast fashion relies on a highly tech-enabled, specialized supply chain that can create and deliver products on demand. Shein's anticompetitive Scheme has targeted this necessary input—suppliers capable of participating in ultra-fast fashion—to prevent competition from innovative and agile competitors such as Temu.

6.     Shein uses its dominant power to coerce manufacturers to enter broad and open-ended exclusive-dealing agreements, ensuring that only Shein can publish, display, or otherwise use the manufacturers' products on its dominant platform.  Moreover, Shein enforces these exclusive-dealing agreements in a manner that purports to strip from the manufacturers all worldwide intellectual property rights in all of the manufacturers' products, or products of a related style, that Shein chooses to sell on its dominant platform.  Shein is able to engage in this conduct in part due to the heavy reliance of ultra-fast fashion suppliers on receiving a large number of small orders, which make them highly dependent on Shein's demand in light of Shein's significant control over the ultra-fast fashion market.

7.     Prior to Temu's entry in the U.S. market, Shein controlled the vast majority of ultra-fast fashion in the United States.  When Shein learned that Temu's market entry was imminent, it promptly imposed additional, onerous exclusivity requirements on suppliers who relied on Shein's order volume.  Shein's Scheme has been successful in locking up supply from approximately 70–80% of available manufacturers (constituting 80–90% of the manufacturing capacity) and protecting Shein's 75+% market share in ultra-fast fashion.

8.     The additional details recently obtained of Shein's anticompetitive Scheme directly support Temu's claims in this action.  These additional facts belie Shein's attempt, previously made in this Court, to evade responsibility for Shein's antitrust violations, including Shein's use and abuse of exclusive-dealing agreements to lock up supply and foreclose competition, including from Temu.

9.     For example, seeing Temu as an imminent threat to its monopoly in the ultra-fast fashion market, Shein imposed some of its more onerous exclusivity restrictions—including express prohibitions on the suppliers dealing with third parties—in response to and in anticipation of the competition presented by Temu's entry into the U.S. market in 2022, as is clear from documents annexed hereto that Shein itself made part of the record in this matter.

10. To further lock up supply, Shein has engaged in mafia-like coercion, including (i) forcing suppliers to sign loyalty attestations that they did not and will not cooperate with Temu, (ii) threatening suppliers that it would "go after" anyone doing business with Temu or any other third party, and (iii) issuing public penalty notices to publicly shame suppliers who have done business with Temu and to intimidate other suppliers away from considering the possibility of doing business with Temu.

11. Shein has also carried out its exclusionary Scheme under the guise of enforcing IP rights against Temu and manufacturers who do business with Temu. In a campaign of monopoly abuse to support its broader Scheme, Shein has attempted to bury Temu in time-consuming copyright infringement threats, serving tens of thousands of infringement notices intended to force Temu to remove competing products from its platform. If tolerated, Shein's conduct would block all competition in ultra-fast fashion.

12. But enforcing IP rights has never been the true objective of Shein's anticompetitive Scheme. Shein's true intentions are to choke supply and exclude Temu from the ultra-fast fashion market. Shein's copyright enforcement campaign is objectively baseless and conducted in bad faith.

13. For example, Shein's recent reference in this Court to an Illinois court's TRO against Temu is misleading, as nothing in the Illinois litigation supports the validity of Shein's anticompetitive Scheme to exclude competition from Temu. Shein failed to tell this Court that, after Temu had the opportunity to present the court in Illinois with evidence of Shein's misrepresentations in asserting its infringement claims, the court granted Temu's request to postpone the proceedings on Shein's request for a preliminary injunction and granted Temu's request for expedited discovery.

14. Shein's anticompetitive and exclusionary Scheme has caused significant harm to Temu, manufacturers, and U.S. consumers. Indeed, Shein's conduct has foreclosed Temu's

access to suppliers necessary for Temu to compete in the dynamic ultra-fast fashion market. As a result, Temu has lost business, lost business opportunities, and suffered substantial financial injury. At the same time, manufacturers that would prefer to sell their products on both Temu's and Shein's platforms essentially are left with no choice but to sell exclusively through Shein, which unfairly restricts their revenue.

15.      In addition, Shein's monopoly abuses have caused substantial harm to consumers. While Shein has resorted to lies, intimidation, and coercion to avoid competition and maintain its monopoly position, consumers have suffered. The direct results of Shein's elimination of competition are higher prices, fewer options, and poorer quality for consumers forced to depend on the entrenched monopolist. These are precisely the types of anticompetitive harms the antitrust laws were designed to prevent.

## JURISDICTION AND VENUE

16.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337(a) (antitrust), and 15 U.S.C. § 15 (Clayton Act) because Plaintiff asserts claims for violations of the federal antitrust laws. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

17.      The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal monopolization Scheme throughout the U.S. and in this District specifically. The anticompetitive Scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District, and throughout the United States. The anticompetitive Scheme directly affects interstate commerce.

18.      Venue is proper in this District pursuant to 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision), because Defendants reside, transact business, are found, or have agents in this

District.  Defendants use social media to target consumers in Massachusetts to join their platform and purchase their products, and they ship consumer goods to and import into Massachusetts.

19.    Moreover, Shein knowingly has targeted Temu, a Massachusetts corporation with its principal place of business in Boston, Massachusetts, with Shein's anticompetitive Scheme.  Shein explicitly has identified Temu in the loyalty attestations that Shein coerced suppliers to sign.  Shein intentionally has carried out its anticompetitive Scheme against a Massachusetts corporation, as Shein has sent knowingly false notices of copyright infringement to Temu that are directed to Temu's agent pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512 et seq., in Massachusetts and that list Temu's Boston address.  As a result, a substantial part of the interstate trade and commerce involved in and affected by Shein's violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have and will continue to have substantial effects in this District.

## **THE PARTIES**

20.    Plaintiff Whaleco Inc. (d/b/a Temu) is a Delaware corporation with its principal place of business in Boston, Massachusetts.

21.    Defendant Roadget Business Pte. Ltd. is a private limited company organized under the laws of Singapore.  Roadget Business Pte. Ltd. owns the website https://us.shein.com and the corresponding mobile application.

22.    Defendant Shein Distribution Corporation ("Distribution Co.") is a Delaware corporation with its principal place of business in Los Angeles, California.  Distribution Co. is an affiliate and licensee of Roadget Business Pte. Ltd.

23.    Defendant Shein US Services, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

24.    Discovery will reveal the precise responsibilities and roles of each of the Shein

entities in connection with Shein's anticompetitive Scheme, but a substantial part of the Scheme's conduct has occurred in the United States. For example, Shein's job postings at the time of filing indicate that Roadget has and seeks U.S.-based employees whose responsibilities include ensuring "that sellers understand and adhere to SHEIN's policies and procedures." Shein has stated that U.S.-based Distribution Co. employees manage supplier "relationships" and Shein's "opportunity pipeline," as well as "renegotiate" contracts.

## FACTUAL ALLEGATIONS

**I.    Shein Has Monopoly or Market Power in the U.S. Ultra-Fast Fashion Market**

### A.    Historical and Environmental Conditions That Led to the Emergence of the Ultra-Fast Fashion Industry

25.     Since the late 20th century, the increasing speed of communications and fast pace of change in fashion has led to strong consumer demand for retailers that can quickly and cheaply manufacture and distribute the latest trends. The first generation of such companies were known as "fast fashion" companies, which created and replaced styles and stock keeping units ("SKUs") offered with new and different products—more frequently than high-end fashion brands. The typical inventory turnover times for fast fashion companies such as H&M and Zara have been roughly 100 days, substantially lower than the inventory turnover time for a traditional fashion player.

26.     Fast fashion comprises companies like Zara, H&M, Primark, and GAP, with some additional niche players such as Uniqlo. These competitors were distinguishable from high-end fashion brands and the rest of the garment industry because of (a) their variety of styles, which touched on the latest trends; (b) their short turnaround time between when a trend or style is seen at a fashion show or in celebrity media and when it hits the shelves; (c) their product offerings that changed routinely within a single season; and (d) their lower price points compared to high-end fashion brands.

27.     Meanwhile, new technology and supply-chain innovations combined to create

consumer demand for a new industry and business model.  From this milieu, a distinct new retail approach beyond fast fashion—called "ultra-fast fashion," or fashion "on demand"— developed.  The speed of fashion increased along with the pace of new trends emerging online and on social media, driving ever faster consumer demand for new fashions and a shorter turnaround time.  The democratization of the Internet and global communications, together with young social media users, created demand for ultra-low-cost, ultra-fast fashion offered in a wide selection of styles and products.  And technology and logistics innovations enabled fast-moving supply chains capable of manufacturing a large number of SKUs to be offered through online sales platforms.  This new market for ultra-fast fashion includes Shein, FashionNova, Zaful, and Cider, as well as Temu's ultra-fast fashion business.

28.     The growth of ultra-fast fashion greatly accelerated during the COVID-19 pandemic.  Compared to retail formats which depend on brick-and-mortar operations, the ultra-fast fashion industry was able to take advantage of the e-commerce sales channel to rapidly grow.  During the same period, Shein leveraged the growth of the ultra-fast fashion industry, continued to entrench its monopoly position, and has now grown to such a scale that it exceeds all fast fashion companies.

29.     Ultra-fast fashion is a unique market that is rapidly growing.  This market is anticipated to outgrow the fast fashion market by a significant margin, as illustrated by the growth trajectory of Shein, the dominant player in ultra-fast fashion.  More specifically, Shein's revenue is projected to grow at a compounded annual growth rate ("CAGR") of more than 60% from 2019 through 2025.

**B.      Ultra-Fast Fashion Is Different in Kind from Fast Fashion Due to Its Design-to-Retail Cycle, Minimum Order Size, Styles, and Price Points**

30.     The defining characteristics of ultra-fast fashion or "on demand" fashion, as compared to traditional fashion and fast fashion, are:

(a) **Expedited design-to-production time.** Time from design to production is completed in just days, versus several months taken by fast fashion and multiple quarters or even years taken by traditional fashion.

(b) **Significantly smaller minimum order requirements.** Minimum order requirements can be as small as 100 pieces per order, versus at least 2,000 pieces per order for fast fashion and at least 20,000 pieces for traditional fashion.

(c) **Significantly faster release of styles.** Styles are released weekly or even daily, with 10,000 styles released in a week or even in a day, versus a few thousand in monthly releases of styles by fast fashion and quarterly releases of a few styles by traditional fashion.

(d) **Internet-based sales.** Sales are internet-based, versus the predominantly brick-and-mortar sales approach of traditional fashion and fast fashion.

(e) **Direct-to-consumer model.** A direct-to-consumer model is used, which utilizes efficient fulfillment centers and air freight shipment that dispatches parcels to worldwide consumers.

(f) **Consumers benefit from price and variety.** Ultra-fast fashion offers products at materially lower price points with significantly diversified styles.

31.    The distinctive qualities of the ultra-fast fashion market contrasted with the characteristics of the fast fashion and traditional fashion markets are summarized below:

|  | Ultra-fast fashion | Fast fashion | Traditional fashion |
|---|---|---|---|
| Design-to-production time | Just days | Several months | Multiple quarters or even years |
| Minimum order requirements | 100 pieces per order | 2,000 pieces per order | 20,000 pieces per order |
| Release of styles | 10,000 styles released weekly or even daily | 1,000s of styles released monthly | A few styles released quarterly |
| Retail method | Predominantly Internet-based sales | Mainly brick-and-mortar sales | Mainly brick-and-mortar sales |
| Price | Materially lower price point than both traditional and fast fashion | Lower than traditional fashion, but higher than ultra-fast fashion | Highest price point |

32.     Apparel production involves multiple stages of design, prototyping, and mass production.  In traditional fashion, this process could take quarters or even years.  The fast fashion cycle is shorter, with a design-to-production process that can be measured in months. In ultra-fast fashion, the entire process takes a matter of days, powered by its specialized manufacturers and technical workers.

33.     The way orders are placed for each industry also differs drastically.  In terms of minimum order quantities, traditional fashion typically requires approximately 20,000 pieces per order.  Fast fashion, with a more frequent rotation of styles, may require only 2,000 pieces per order to complete its monthly releases.  Because ultra-fast fashion builds its unique business model by closely following the latest trends on social media and aiming to produce trendy styles that consumers see and want that very moment, as few as 100 pieces are all that are needed for an order, to quickly test the market.  The unique nature of ultra-fast fashion sets a much higher bar for factories and workers as they need to be able to produce thousands of diversified styles in much smaller quantities but at a faster pace.

34.     Supported by this network of specialized manufacturers and technical workers who produce the styles in small order sizes and under a fast turnaround time, ultra-fast fashion operates on a different scale than fast fashion retailers, by launching tens of thousands of styles

weekly, or, when moving at full speed, even hitting this number within a day. Comparatively, fast fashion brands like Zara and H&M release hundreds or a few thousand styles on a monthly basis.

35.    According to the trade journal *Business of Fashion*, Shein adds thousands of new items to its U.S. site each ***day,*** while fast fashion retailers, such as H&M and Zara, add thousands of new items to their U.S. site each ***year***. *Business of Fashion* also reports that Shein added 314,877 new items to its U.S. site over the same period that H&M added 4,414 and Zara added 6,849.

36.    The high volume of SKU production and the fast rotation of styles for ultra-fast fashion makes it infeasible for a single company to complete the design, prototyping, and mass production by itself. In fact, it is the thousands of suppliers, not Shein, that design the great variety of styles and make the quick production possible.

37.    In terms of the medium for shopping, both traditional and fast fashion sellers rely heavily on brick-and-mortar stores. By contrast, ultra-fast fashion sellers reach consumers primarily through online channels with the worldwide web of e-commerce platforms and the lightning speed of their logistics systems. To reduce the travelling time of parcels, fulfillment centers for ultra-fast fashion are located within the nexus of the factories, and goods placed by suppliers in the fulfillment center are not stored for long. Instead, they are immediately sorted and packed into small parcels, and thereafter swiftly shipped to consumers globally using air freight logistics.

38.    With smaller minimum order sizes, ultra-fast fashion also innovates by reducing costs, including through avoiding excess inventory as fashion trends change and "avoid[ing] the need for overproduction typically associated with filling physical storefronts." *See* Shein, About Us, available at https://sheingroup.com/about-us.

39.    As a result of its supply-chain efficiencies, ultra-fast fashion also offers an even

lower price point than fast fashion.

40.    Several media reports have highlighted that Shein sets its price points at more than a 50% discount when compared to fast fashion retailers like Zara and H&M.  A third party has summarized the pricing as follows:

      (a)    Dresses average $16 on Shein, but $30 on H&M and $48 on Zara, approximately 47% and 67% lower, respectively;

      (b)    Jeans average $19 on Shein, but $31 on H&M and $42 on Zara, approximately 39% and 55% lower, respectively;

      (c)    Women's tops average $10 on Shein, but $23 on H&M and $36 on Zara, approximately 57% and 72% lower, respectively; and

      (d)    Women's outerwear averages $20 on Shein, but $51 on H&M and $96 on Zara, approximately 61% and 79% lower, respectively.

41.    Shein and Shein executives routinely describe their market as "on-demand" fashion or "faster" or "supercharged" fast fashion—in other words, ultra-fast fashion—and distinguish it from traditional fashion and fast fashion.  Indeed, in a July 2023 interview in *Time Magazine*, Shein's Executive Vice Chairman Donald Tang distinguished Shein's business from the fast fashion model:

Q.  Fast fashion has been around for a while, but Shein's business model is different.  Can you explain how you operate differently than an H&M or Zara?

A.  We are on-demand fashion.  We try to figure out what you want.  And then we make it for you.  So we always have very, very low single-digit inventory numbers.  Whereas [other retailers] have to design things and then they stock them, market them and then sell them.  And then they have leftovers.  We have very, very little leftovers.

42.    The distinct features associated with ultra-fast fashion have also been recognized by the entire fashion industry, including trade journals and fashion publications such as *Business of Fashion*, *Fashion Week Online*, and *Fashion United*.

43.    The unique characteristics of the ultra-fast fashion model satisfy demands of

consumers unmet by fast fashion.  Ultra-fast fashion meets the unique demands of today's decentralized and increasingly consumer-driven trends by offering more new styles much faster than fast fashion and by more closely linking the manufacturer and the end customer.

44.    Other garment retailers, including fast fashion retailers, are not reasonable substitutes for the ultra-fast fashion experience in part because ultra-fast fashion platforms offer significantly more new styles, and these styles change effectively on a daily basis.  For ultra-fast fashion consumers, other options are not viable substitutes in part because of the staleness of the styles and the limited style options available.  Ultra-fast fashion offers a distinct service and unique experience that allows consumers to shop for a significant variety of styles and caters to customers who have decided that significant variety and quick refreshes of styles are important.

45.    The high-speed, high-churn, and low-inventory nature of ultra-fast fashion requires market participants to generate all or virtually all of their sales from online sales.  In contrast, for fast fashion companies, including Zara and H&M, only approximately 30–35% of their sales occur online.  Because ultra-fast fashion players offer a large number of styles in relatively small runs, combined with a high style churn on a daily basis, a brick-and-mortar channel with space and physical restrictions is not a viable sales format for ultra-fast fashion companies.

46.    Amazon's and Walmart's online operations cannot meet the consumer demand that Shein and Temu do by adding designs quickly, relying on those capable ultra-fast fashion manufacturers and workers to deliver fashion at break-neck speed.  Consumers demand the unique package of features that ultra-fast fashion companies offer, and do not consider them interchangeable with traditional retailers or fast fashion.

47.    Ultra-fast fashion outlets must obtain their supply from manufacturers that possess a unique combination of capabilities and expertise.  Ultra-fast fashion suppliers create

a high volume of new products and styles, requiring fast design and rapid changeover from one product to another. They must act as their own designers by creating their own styles, be sophisticated in e-commerce, and be able to fit into the high-speed ultra-fast fashion supply chain. And ultra-fast fashion suppliers must do all of this on tight margins. They must also have a specialized and highly trained pool of garment workers, designers, and quality control professionals with extensive experience in ultra-fast fashion. As a result, the pool of actual and potential ultra-fast fashion suppliers is significantly smaller than manufacturers capable of producing apparel for export.

48.    In sum, the facts above demonstrate that ultra-fast fashion is a distinct antitrust market identified by:

(a)    Industry recognition, including as evidenced by Shein's own admissions and trade publications;

(b)    A unique business model that facilitates the launch of styles at a much faster pace and with greater variety;

(c)    Distinct price differences;

(d)    Trend-driven consumers;

(e)    Consumers who demand the unique characteristics or bundle of services that ultra-fast fashion provides;

(f)    Specialized online outlets;

(g)    A direct-to-consumer model that utilizes efficient fulfillment centers and air freight to deliver parcels to consumers worldwide; and

(h)    Unique production factors, including an ultra-low overhead approach and a unique supplier base that must adapt to new fashion trends at light speed.

49.    For all the reasons above, the relevant antitrust product market is the ultra-fast

fashion market.

C.    **The Linchpin of Ultra-Fast Fashion:    Uniquely Skilled, Specialized Suppliers and Technical Workers**

50.    Ultra-fast fashion dramatically breaks from the fast fashion model by relying on a highly tech-enabled supply chain that includes a limited pool of independent clothing makers that can create and deliver products on demand.  Ultra-fast fashion manufacturers require:  (1) a pool of skilled, technical workers with years of experience and practice in sewing, cutting, pressing, seaming, trimming, tailoring, and other skills; (2) in-house designers who can both design independently (as opposed to relying on designs shared by, for example, Zara) and construct apparel in response to designs provided by fashion houses; and (3) deep know-how and effective working procedures to support large numbers of ultra-fast fashion orders.  At the same time, to ensure efficient access to the necessary raw materials, ultra-fast fashion suppliers require (4) close proximity to their upstream suppliers (of fabric, fiber, buttons, and other raw materials); and (5) strong local transportation infrastructure.

51.    Only with this combination of traits can ultra-fast fashion manufacturers deliver orders in less than half the time that fast fashion permits.  The combination and mastery of these capabilities sets ultra-fast fashion suppliers apart from suppliers of fast fashion or any other fashion market.

52.    Ultra-fast fashion also revolutionizes the speed a trendy item reaches a consumer through efficient fulfillment centers that do not store inventory for long but pick up, pack, and ship goods in one go followed by swift delivery via air freight logistics.

53.    The limited pool of experienced, quick-turnaround independent manufacturers, together with the limited numbers of specialized technical workers, creates a critical barrier to entry in ultra-fast fashion, including for fast fashion and other fashion retailers who could not reasonably compete for ultra-fast fashion sales.

54.    Today, approximately 10,000 of these manufacturers have the capability for

small-batch, flexible production at a low cost.  In order to run these highly specialized operations and support an industry that is now worth tens of billions of dollars (and growing), each of these suppliers requires, on average, over 100 technical workers to execute the requisite processes to supply ultra-fast fashion products.  Designing and producing products for the ultra-fast fashion industry is nearly impossible without hiring a sufficient number of such skilled workers.  These technical workers have all undergone extensive training to acquire and refine their skills.  For instance, each manufacturer requires its technical workers to have a specialized skillset to bridge the gap between design and actual production.  It can take at least five years of immersion in ultra-fast fashion, as well as exposure to numerous apparel styles, for a garment worker to gradually accumulate the necessary knowledge and to understand how to streamline designs and costs.  Similarly, years of experience are necessary to excel in other vital job roles in the ultra-fast fashion industry.  The accumulation of skills among these technical workers is a gradual process that happens through on-the-job experience, from mastering basic sewing and stitching techniques, to becoming adept at handling specialized styles, and taking on leadership roles in garment repair and efficient production processes.  Therefore, such an extensive learning process sets an inherent barrier to entry and a ceiling on the number of total ultra-fast fashion suppliers.

55.    These manufacturers' capabilities align perfectly with the demands of ultra-fast fashion, where consumers demand access to diverse, rapidly changing styles, low prices, and a seamless integration of online shopping with social networks.  The inability to contract with the majority of these unique suppliers significantly hampers the competitiveness of an ultra-fast fashion competitor, as it results in a loss of sales opportunities due to the reduced variety of styles that can be produced.

56.    Importantly, Shein, due to its vast scale and network of coercive, exclusive-dealing agreements, wields significant control over the majority of these suppliers.  Shein

clearly recognizes that control of this supply chain provides it with a critical—and unfair—advantage in this industry and is determined not to let competitors, especially Temu, gain a foothold.

57.     Shein's Scheme primarily targets this limited and necessary input—independent ultra-fast fashion manufacturers—by preventing them from working with Temu.   Shein's Scheme does so not by competing on the merits, but by locking manufacturers into exclusive-dealing agreements and engaging in intimidation, public shaming, and unreasonable penalties and payment delays to suppliers doing business with Temu.

**D.     Shein Is the Dominant Player in the U.S. Ultra-Fast Fashion Market and Continues to Entrench Its Monopoly**

58.     Shein has monopoly or market power in the U.S. ultra-fast fashion market.

59.     Among the ultra-fast fashion retailers, Shein is by far the largest competitor with more than 75% of U.S. market share by sales volume in 2022.   It sells men's, women's, and children's apparel, along with other products, in the United States through its website, https://us.shein.com, and its corresponding mobile app.

60.     Shein's customer base and sales have exploded since early 2020.   Its global annual revenue is estimated to have grown from around $3 billion in 2019 to around $30 billion in 2022, with approximately $9.6 billion in the United States in 2022.   In the first half of 2022, Shein's app was the most downloaded shopping app in the United States, eclipsing Amazon, with approximately 22.4 million downloads during those six months.

61.     Shein has a network of approximately 8,338 suppliers in its ultra-fast fashion line of business.

62.     As its ultra-fast fashion revenue and app downloads continue to grow, so does Shein's dominance in ultra-fast fashion in the United States.   Temu, and the consumers who would benefit from the increased competition from Temu, have suffered substantial harm as a result of Shein's increasingly dominant position.   Shein's exclusive-dealing agreements have

caused suppliers to remove their products from Temu's platform, allowing Shein to further entrench its monopoly position.

63.     Shein did not have significant ultra-fast fashion competition in the United States until Temu's entry into the United States in the fall of 2022.  Temu's full category e-commerce marketplace, which leverages the efficient ultra-fast fashion fulfillment system for all categories of products, offers a wide range of products, including ultra-fast fashion.

64.     Temu and its affiliated companies have actively competed against Shein and its affiliates on a global scale by empowering small suppliers and facilitating their expansion into global markets.  Temu has proven to be Shein's fiercest competitor, both in terms of manufacturer feedback and consumer satisfaction.

## II.    Temu's Entrance into the U.S. Market Posed a Grave Threat to Shein's Dominance

65.     Temu entered the U.S. market in September 2022.  Its goal was simple:  to offer quality products at affordable prices.  Shein immediately identified Temu to be its closest and most direct competitor that could challenge Shein's monopoly position in U.S. ultra-fast fashion market.

66.     Shein acts as a reseller, purchasing products independently designed by small suppliers at low prices and then reselling such products at much higher prices on the Shein website.

67.     In contrast to Shein's model, Temu operates as a full-category e-commerce marketplace that utilizes the efficient fulfillment and logistics system introduced first in ultra-fast fashion.

68.     Temu empowers these suppliers with efficient and integrated logistics solutions, global market access, and the benefits of keeping and growing with their own IP rights.  Merchants on the Temu platform may start small, but they are motivated for long-term success because they can benefit from their self-owned IP in the long run.  In this way, Temu works

hand-in-hand with suppliers to offer more choices to consumers. This empowerment of merchants across various categories is the reason Temu has been able to continuously grow in categories other than ultra-fast fashion and to perform well on the most downloaded app charts. However, due to Shein's exclusionary and anticompetitive conduct to maintain its monopoly in the ultra-fast fashion market, Temu's ultra-fast fashion business has suffered substantial harm.

69.     Like Shein, nearly all of Temu's ultra-fast fashion product offerings in the United States come from a specialized network of manufacturers located in China. The apparel product offerings on the Shein and Temu platforms are naturally similar as they are both geared toward staying abreast of the latest mass-fashion trends desired by consumers.

70.     Temu beats just about everyone on price. The apparel sold on the Temu platform is sold at prices substantially lower than those of H&M and Zara and other e-commerce retailers like Walmart and Amazon—and even lower than Shein's prices. Indeed, Temu routinely beats Shein on price for ultra-fast fashion apparel products. An analysis of products that were offered on both Shein and Temu's platforms showed that Temu's prices usually were lower than Shein's by 10–40%.

71.     Shein has controlled nearly the entire market in ultra-fast fashion in the United States between early 2020 and Temu's entry in late 2022. Because Shein is a non-diversified business—as much as 90% of Shein's U.S. sales are in ultra-fast fashion—Temu's entry posed a grave threat to not only Shein's dominance in ultra-fast fashion but its entire business model. As a result, Shein now views itself as being "at war" with Temu—a war Shein is committed to winning at any cost.

III.    **In Response to Temu's U.S. Entry, Shein Commenced an Anticompetitive Scheme Targeting Temu in Order to Preserve Shein's Monopoly Position**

72.     Shein's campaign aimed to prevent and to cut off Temu's access to the most efficient and capable suppliers. Specifically:

(a)   Shein forces manufacturers to enter into exclusive-dealing agreements that mandate exclusive supplier relationships and threatens manufacturers with onerous fines and penalties if they supply product to Temu;

(b)   Shein forces manufacturers to sign loyalty attestations containing false statements and certifications that they will not do business with Temu, but such attestations are silent as to any other competitor or potential competitor;

(c)   Shein issues public penalty notices and imposes extrajudicial fines on disobedient manufacturers for supplying products to Temu, practices that simultaneously punish manufacturers that dare to do business with Shein's closest competitor and warn other manufacturers that Shein will not tolerate any manufacturer doing business with Temu; and

(d)   Shein sends numerous false notices of copyright infringement to Temu in order to disrupt sales of products that are offered for sale on Temu. These notices are almost always aimed at products that Temu sells at lower prices than Shein charges for identical or similar products.

73.   These acts form Shein's anticompetitive strategy—an integrated Scheme to prevent and exclude competition in the U.S. ultra-fast fashion market.

**A.    Shein Has Coerced Suppliers Through Exclusive-Dealing Agreements, Pricing Floor Requirements, Loyalty Attestations, Threats, and Intimidation to Lock Up Supply for the U.S. Ultra-Fast Fashion Market**

**1.    Shein Has Coerced Suppliers into Entering Exclusive-Dealing Agreements and Tightened Its Exclusive Terms Step-by-Step to Hinder Temu's Entry**

74.   Through exclusivity requirements and other restrictions that have become increasingly strict over time, Shein has strongarmed 70–80% of all suppliers who manufacture clothes for the ultra-fast fashion market into entering explicit and *de facto* exclusive

relationships with Shein through a combination of coercive tactics.

75.    The ultra-fast fashion suppliers did not enter into these exclusive-dealing agreements with Shein knowingly or willingly.  The vast majority of these suppliers bound by contracts with Shein are small businesses with limited resources, often microfactory operations that do not have the resources to hire a corporate or intellectual property attorney to vet their business contracts.  Many suppliers began business relationships with Shein under wholly different terms.  But through Shein's deceptive and coercive tactics, these suppliers later entered into exclusive-dealing agreements that Shein has since used as a sword to keep them from supplying competitors such as Temu.

76.    When Shein first began contracting with both small and large suppliers, its agreements with suppliers did not prohibit the suppliers from offering their styles to third parties.  Those agreements, entered into well before news began to spread regarding Temu's pending entry in the U.S. market, provided clearly and simply that:  the IP rights to the styles provided by Shein would belong to Shein, and the IP rights to the styles provided by the supplier would be retained by the supplier.

77.    Shein gradually updated its supplier agreements in order to add provisions allowing it to seize IP rights from its suppliers.  The IP clause in Shein's supplier agreements evolved into a stricter clause that required the suppliers to grant free, 12-month exclusive licenses to Shein for all product styles, images, and videos provided by the supplier to Shein.  At the 12-month mark, this exclusive license became a permanent, but not exclusive, license to Shein for the same rights.

78.    By late August 2022, Shein further expanded the coverage of the exclusivity provisions in its suppliers' agreements.  Shein made the Exclusive-Dealing Agreement part of the record in this case, and a copy is provided as **Exhibit A** to this Amended Complaint.

79.    The critical amendments made to the Exclusive-Dealing Agreement right before

the launch of Temu in the United States include provisions that (i) force suppliers to grant a worldwide, irrevocable, and exclusive license for Shein to "publish, display, reproduce, improve, or otherwise use" the suppliers' products and related styles (Ex. A, Part I, Art. II.11(1)); (ii) force suppliers to initiate a mandatory transfer to Shein of the IP rights in the images, photos, or videos of such products (*id.* at Part I, Art. II.11(2)); and (iii) prohibit suppliers from using or displaying the aforementioned styles (*id.* at Part I, Art. II.11(1)), to the effect that such suppliers would not be able to list any of the same styles on any third-party platform.  As a result, just days before Temu entered the market, Shein had contracts in place that functioned as Exclusive-Dealing Agreements.

80.     For example, if a manufacturer independently designed and developed a dress that was provided to Shein for purchase, that manufacturer is permanently prohibited from even displaying that dress through the Temu platform or through any other competitor of Shein.  Yet, Shein's exclusionary requirements do not stop there, as the supplier is also prohibited from even improving upon or otherwise using the style of dress for sale by any competitor.

81.     Moreover, the Exclusive-Dealing Agreement expressly established unreasonable enforcement provisions against manufacturers that might engage with Shein's competitors in legal, pro-competitive conduct to sell, improve upon, develop, or "otherwise use" the styles the manufacturer had developed and presented to Shein for selection. Specifically, Shein's Exclusive-Dealing Agreement: (i) imposes a penalty of RMB 3,000 (approximately $450) per style, picture, or video for any third-party "use" authorized by a manufacturer, or Shein's alleged actual financial loss (whichever is higher), in addition to what Shein falsely calls "reasonable income lost" by Shein if the manufacturer generates any income from its own use or such third party use (Ex. A, Part I, Art. II.11(7)); and (ii) allows Shein to unilaterally terminate the Exclusive-Dealing Agreement and thereafter require a manufacturer to compensate it "for the relevant losses" if the manufacturer does not timely rectify what Shein

deems to be a violation (*id.* at Part II, Art. J).

82.     Shein further stepped up its exclusive-dealing terms, escalating the requirements of the Exclusive-Dealing Agreement to include a mandatory and all-inclusive IP transfer clause that covers all IP rights in the styles, and related images and videos, selected by Shein for purchase, and prohibiting the supplier from listing its products on third parties' platforms such as Temu's marketplace. Prior to this update, the agreements only required the suppliers to (i) transfer to Shein the IP rights in the photographs, pictures, and/or videos of any products they provided to Shein, and (ii) license to Shein the IP rights to use the provided products and any of the related styles. Critically, in the previous iterations of the agreements, the suppliers were able to maintain ownership of the rights to the products and styles they provided to Shein. After this update to the Agreement, suppliers lost all of their IP rights in the styles of products they provided to Shein (including but not limited to any photographs, pictures, and/or videos of such products).

83.     For example, Shein's recent Exclusive-Dealing Agreements also increased the penalties for a supplier's attempt to escape Shein's exclusionary tactics, including, for example, increasing the RMB 3,000 penalty per violation of its exclusive terms by a factor of 10 (to RMB 30,000).

84.     These penalties serve no legitimate purpose except to punish manufacturers for doing business with Temu and create an additional form of *de facto* exclusivity in light of the razor-thin profit margins in ultra-fast fashion.

### 2.     Shein's Agreements with Suppliers Contain Anticompetitive Pricing Floor Requirements

85.     Shein's agreements with suppliers also contain an anticompetitive "Price Commitment" restriction that further constrains competition from competing marketplaces and stymies the ability of suppliers to do business with other marketplaces such as Temu. As alleged above, Shein enforces its Exclusive-Dealing Agreements in a way that prevents

suppliers from offering on a competing marketplace any products or related styles offered on Shein's website.  However, in the event a supplier somehow offers the same product on both the Shein website and a competing marketplace, then—in addition to facing punitive and retaliatory penalties for violating the exclusivity requirements of the Agreement—Shein's pricing floor term would prevent the supplier and marketplace from competing to sell the product through lower prices.

86.     Upon information and belief, Shein enforces its "Price Commitment" term in a manner that prevents suppliers from offering products sold on Shein's website for lower prices on competing marketplaces.  (Ex. A, Part I, Art. II.8.)  In the version of the Exclusive-Dealing Agreement that Shein attached to its motion to dismiss in this litigation, Shein has filed under seal most of this clause.

87.     In the portion of the "Price Commitment" term not redacted by Shein, suppliers are further deterred from providing lower prices to Temu or other third parties by the requirement that the supplier pay Shein a penalty of "double the overpaid purchase fee" if the supplier is unable to "adjust the price and promptly notify [Shein] within 1 business day from the date it knows or should know" that its product is being offered at a lower price by a competitor to Shein.  (Ex. A, Part I, Art. II.8(2).)

88.     The Exclusive-Dealing Agreement's pricing floor term works in conjunction with Shein's other anticompetitive and restrictive provisions to keep suppliers from doing business with Temu or other competitors.  Suppliers who may have the ability to offer a lower supply price to Temu may be restricted from offering those lower prices if it would be unprofitable to offer price parity to Shein.  Accordingly, these anticompetitive pricing floor clauses harm Temu's ability to compete with Shein.  Further, the retaliatory penalty that attaches to the pricing floor term deters suppliers from offering more competitive prices to Temu and other competitors.

89.     Moreover, Shein's pricing floor restrictions—and retroactive fees and retaliatory penalties—keep prices for ultra-fast fashion products artificially high and restrict supply, to the detriment of consumers, suppliers, and competing marketplaces.  If not for these restrictions, sellers would be free to offer products for lower prices on other sites, benefitting consumers (paying less), suppliers (selling more), and competing marketplaces (greater selection and greater sales).

> **3.     Shein Has Forced Suppliers to Sign Loyalty Attestations and Engaged in Mafia-Like Coercive Management Tactics to Further Lock Up Supply**
>
> **(A)     Shein Has Forced Suppliers to Sign Loyalty Attestations That They Did Not and Will Not Cooperate with Temu**

90.     Shein also demands that manufacturers execute false and misleading Loyalty Attestations against Temu.  Shein made available a version of the Loyalty Attestation that is part of the record in this case.  A copy of it is attached hereto as **Exhibit B**.

91.     First, the Loyalty Attestation recites a lengthy loyalty oath in which the manufacturer must affirm, among other things, that:

> (a)     it has "never cooperated with Temu on the production and sales of the infringing products"; (Ex. B, Loyalty Attestation, at "Supplier Attestation" (1))
>
> (b)     "The infringing products or their images displayed and sold on the Temu website are not provided to Temu by Supplier," (*id.* at "Supplier Attestation" (2))
>
> (c)     "the infringing products and images on the Temu website violate the legitimate rights and interests" of Shein (*id.* at "Supplier Attestation" (3)); and

(d)    the manufacturer will inform on any other actor, or provide "any other

information," that could help Shein police its illegal Exclusive-Dealing

Agreements (*id.* at "Supplier Attestation" (4)).

92.    These Loyalty Attestations, with repeated references to Temu, make it clear that

Shein's intended result is to block these suppliers from working with Temu in order to preserve

Shein's monopoly power.

93.    Second, the Loyalty Attestations misleadingly use the defined term "infringing

products," which is defined—contrary to both reason and law—to mean any product sold on

Temu that is the same or "highly similar" to products that Shein is reselling from the

manufacturer.   While Shein includes throwaway references to intellectual property in the

Attestation, the definition of "infringing products" is in no way tied to IP rights but extends to

any products that fall under the Exclusive-Dealing Agreements and that appeared on Temu's

platform.

94.    Thus, like the Exclusive-Dealing Agreements, the Loyalty Attestations go

beyond the scope of Shein's falsely claimed IP rights by purporting to prohibit manufacturers

from working with Temu.

95.    The paucity of any reasonable basis for the Loyalty Attestations Shein has

extracted from its suppliers is clear from what it requires those suppliers, in a single page, to

attest to.  For example, without any specifics, or any reference to any product names, SKUs, or

other identifier other than the language referenced in paragraph 91 above showing that the

products were designed by the manufacturer, Shein requires its manufacturers to attest that the

allegedly "infringing products and images on the Temu website violate the legitimate rights

and interests of Supplier and SHEIN, including the rights, ownership, and interest in various

intellectual property."  Shein thus forces suppliers to "attest" that goods that the manufacturer

itself sold through the Temu platform violated the supplier's own "legitimate rights and

interests."

96.     Shein exerts its dominant position to force these manufacturers to agree to the commercially unreasonable terms in the Exclusive-Dealing Agreement and the Loyalty Attestation.  These exclusionary terms are inconsistent with industry practice, and it is only through Shein's exercise of its market or monopoly power that it can coerce manufacturers to agree to them.

### (B)     Shein Threatened Suppliers That It Would "Go After" Anyone That Supplied Temu or Any Other Third Party

97.     By deceptively and coercively forcing suppliers into the Exclusive-Dealing Agreements with Shein with increasingly broad exclusivity provisions, Shein locks up the suppliers in an exclusive relationship.

98.     Now that the suppliers' IP rights had been signed away, Shein made it very clear to suppliers that any use of the products that the suppliers had listed on Shein's site, or the use of "related styles" on platforms other than Shein, would be an "infringement" of Shein's newly-obtained IP rights.  Suppliers could not use the professional photos they previously had purchased for their products.  What once belonged to the suppliers now belonged to Shein. Many suppliers explained to Temu that it was not financially feasible for the supplier to join Temu's platform, since they would need to purchase another set of professional photos for their products.

99.     Shein also communicated to suppliers that it intended to enforce the Exclusive-Dealing Agreements if suppliers decided to work with a third party.  According to several manufacturers who decided to not work with Temu, or who removed products from Temu's platform, Shein's firm statement that it would enforce its coercive agreements was enough to intimidate suppliers from working with any third-party platform and to keep the suppliers' products exclusive to Shein.  Therefore, in practice, Shein's Agreements were Exclusive-Dealing Agreements covering all of the respective suppliers' business, and not simply the

products and styles currently being offered on Shein's website.

100.    Suppliers also cited the embarrassment their businesses would suffer if they faced a lawsuit by a company like Shein.  The newly amended Exclusive-Dealing Agreements contain clauses that impose extraordinary penalties on suppliers if they worked with a third party such as Temu.  For the suppliers, the possibility of prolonged litigation with Shein was not a risk they could bear.

**(C)    Shein Has Used Public Penalty Notices to Publicly Shame Suppliers Who Did Business with Temu and to Intimidate Other Suppliers from Considering the Possibility**

101.    While Shein's threats to suppliers often occur quietly, through backdoor channels, one intimidation tactic it has taken against suppliers is very public.  On the website "geiwohuo.com," which serves the global supplier system, Shein uses the site's bulletin board to intimidate suppliers into staying in an exclusive relationship with Shein.

102.    For example, on February 24, 2023, Shein posted a notice titled, "[Important] Notice to all supplier partners:  Regarding the Management of Suppliers Who Violate Contract Agreements and Undermine Cooperation Trust."  In this notice, Shein promised to take "strict measures against any violations or breaches" of the Exclusive-Dealing Agreements that suppliers entered into with Shein.  The punishment Shein would inflict on suppliers would be three-fold, according to this notice:  "(1) According to the agreement, a specific amount of liquidated damages shall be demanded in case of breach; (2) The system will mark the supplier as dishonest and reduce future cooperation input for dishonest suppliers; (3) Conduct price verification for all its products on sale and upcoming releases."  Shein also made clear its measures were "not limited" to the ones enumerated in this post.

103.    More insidious, however, are the notices that Shein posts regarding specific suppliers on geiwohuo.com.  When suppliers "infringe" Shein's "legal rights and interests" by selling their products on other platforms, such as Temu, Shein posts notices naming the specific

28

suppliers that "infringed," as well as the monetary penalties Shein intended to impose on that supplier.  For example:

    (a)    In September 2022, Shein posted a penalty notice naming supplier Zunqian, and Shein's intention to impose a penalty of RMB 200,000 (approximately $27,500).

    (b)    In September 2022, Shein posted a penalty notice naming supplier Heying, and Shein's intention to impose a penalty of RMB 69,000 (approximately $9,400).

    (c)    On February 7, 2023, Shein posted a penalty notice naming suppliers ODM Garment 3, Xinlianda, and ODM Menswear Xianyang, and Shein's intention to impose a penalty of RMB 50,000 (approximately $6,800) on each supplier.

104.    Any one of Shein's intimidation tactics against its suppliers would be sufficient to maintain a coerced, exclusive relationship between Shein and the supplier.  When these intimidation measures are all taken together, many suppliers (large and small) have no choice but to work with one monopoly distributor, Shein.

### 4.    Shein's Enforcement Campaign Far Exceeds Its Rights Under Its Contracts with Suppliers

#### (A)    Shein Has Imposed Exclusivity on Suppliers in Ways Beyond the Written Terms of the Exclusive-Dealing Agreements

105.    In a situation when fighting Shein in court is not a real option for the small supplier, the Exclusive-Dealing Agreement, in effect, becomes whatever Shein says it is. Through Shein's backdoor communications with its suppliers, suppliers became aware that Shein was "targeting" them.  At the suppliers' request, Temu removed all of the products from Temu's platform with the same SKUs that appeared on Shein's platform.  It is unclear what, if any, intellectual property rights attach to those products—and in any case, Shein did not explain to the suppliers what IP rights were at issue.  It was sufficient for Shein to intimidate the

manufacturers by simply announcing that penalties would apply if the suppliers did not remove their SKUs from Temu's platform.

106.    Upon information and belief, Shein has also imposed exclusivity in a way that was broader in scope than even the Exclusive-Dealing Agreements' exclusive terms.  One supplier that removed its products from Temu's platform reported the extent of Shein's retaliation.  The supplier listed 200 SKUs on both Temu's and Shein's platforms over the course of five months.  According to the supplier, Shein conducted an "intensive" investigation against the supplier.  Shein even resorted to physical intimidation against the supplier by stationing Shein employees outside of the supplier's business to make sure the supplier did not supply Temu's platform.

### (B)    Shein Can Offer No Procompetitive Justification for Its Misconduct

107.    The exclusivity provisions under the cover of "IP clauses" in the disclosed Exclusive-Dealing Agreement and the Loyalty Attestations are couched in legal language so that Shein can, as it did in its first motion to dismiss, use legal enforcement as a pretext for its illegal conduct, and obscure the fact that its conduct is no different from other firms with market or monopoly power that impose illegal exclusive-dealing arrangements on their counterparties.

108.    As explained above, the Exclusive-Dealing Agreements and Loyalty Attestations both go beyond the scope of legitimately owned IP protection to include "improvement" and "use" of styles.  They also go beyond what Shein actually purchases to include "related styles" or "highly similar styles" of the products provided to Shein.

109.    Shein has falsely asserted that its manufacturers' products were designed by or made specifically for Shein.  Shein has admitted, however, that it did not participate in the design and development of some styles provided by the manufacturers.  In multiple lawsuits in which Shein was accused of copyright infringement, Shein has responded that it was not responsible because its suppliers independently had created the products.  *See, e.g., Tianhai*

*Lace Co. LTD et al v. Zoetop Business Co. Limited et al.*, Dkt. No. 2:22-cv-06106, ECF No. 69 (C.D. Cal.); *Minx International, Inc. v. Shein Distribution Corp.*, Dkt. No. 2:22-cv-02699; ECF No. 21 (C.D. Cal.); *Infinity Printex, Inc. v. Shein Distribution Corp.*, Dkt. No. 2:22-cv-03189, ECF No. 15 (C.D. Cal.); *Universal Dyeing and Printing, Inc. v. Zoetop Business Co., Ltd.*, Dkt. No. 2:22-cv-03741, ECF No. 13 (C.D. Cal.). Shein cannot absolve itself of copyright infringement by blaming its suppliers while at the same time claiming contractually to have created those same suppliers' designs to dodge antitrust claims.

110.    Shein also has falsely asserted that its Exclusive-Dealing Agreements are short-term contracts and easily terminable. For suppliers, the Exclusive-Dealing Agreements are difficult to terminate. After a probationary period, the Agreement automatically renews for another year, and is automatically renewed again at the end of each one-year term. To stop automatic renewal, the supplier must give notice of non-renewal at least 30 days prior to the expiration date. (Ex. A, Part I, Art. II.2). Moreover, the Agreement contains and imposes upon suppliers complicated, internally inconsistent notice requirements. Upon information and belief, some suppliers may not be aware of, or may not understand how to comply with, the contract's requirements to terminate the Exclusive-Dealing Agreements.

111.    More importantly, suppliers are deterred from terminating the Exclusive-Dealing Agreement because, even if they successfully provide notice of non-renewal during the appropriate window of time, the suppliers remain locked into the Exclusive-Dealing Agreement for the remainder of the term (at least 30 days) after providing notice of non-renewal. (Ex. A, Part I, Art. II.2).

112.    Upon information and belief, suppliers fear the possibility of retaliatory measures and punitive fines from Shein during the remainder of the term. As alleged above, these suppliers have been bombarded by Shein with demands to sign Loyalty Attestations, public penalty notices televising the punishment of suppliers deemed by Shein to have breached

the Agreement, and direct, intimidating communications from Shein.

113.    Shein's beholden suppliers' operations run on extremely thin margins, and major disruptions—such as potentially losing Shein's orders during the remaining period of time the supplier is locked into the Agreement, while the Agreement continues to prevent suppliers from dealing with third parties—would be devastating to the suppliers' businesses.

114.    The legal language used throughout the Exclusive-Dealing Agreements and Loyalty Attestations also serves the same *in terrorem* purposes as Shein's penalty notices and unreasonable fines—to prevent defections, ensure merchant compliance, and chill competition.

115.    The Loyalty Attestations are also unreasonable, unenforceable, and illegal because they require manufacturers to attest to blanket falsehoods.  Only a monopolist could extract false Attestations from thousands of commercial counterparties.

### B.    Under the Guise of IP Enforcement, Shein Has Mounted a Campaign to Lock Up Supply in Ultra-Fast Fashion and to Hinder Temu's Entry

116.    Leveraging the coerced, sham IP transfers from its Exclusive-Dealing Agreements, Shein used U.S. copyright law as a form of exclusionary conduct.  These transfers were not a good faith effort to obtain legitimate IP relief but instead a campaign to disrupt Temu's supply and ability to market and sell products in competition with Shein.  Between January and July 2023 alone, Shein served a blizzard of takedown notices for 28,000 products on Temu, asserting that Temu's competing products fail to comply with the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512 et seq.  In many cases, the takedown notices are asserted for products on Temu's platform that are merely similar to Shein's copyrighted image.

### 1.    Shein's True Objective Has Never Been Enforcing IP Rights, But Excluding Competition

117.    Shein's efforts to support its Scheme under the guise of IP litigation and thousands of baseless takedown notices to Temu have nothing to do with protecting valid IP rights.  Shein's true intentions behind its time-consuming and baseless campaign are to choke supply and exclude Temu from the ultra-fast fashion market.

118.    Shein fabricated its so-called IP rights through its coercive Exclusive-Dealing Agreements, which forced suppliers to transfer their IP rights to Shein.  Shein sought those rights not in the interest of protecting valid IP rights but instead to use as a weapon in malicious IP infringement claims against Temu and suppliers who have done business with Temu.

119.    Shein wants to paint Temu as a habitual infringer, but the record reflects the opposite.  To date, Temu has been named as a defendant in only ten lawsuits alleging IP infringement and, ironically, there is strong evidence that at least eight out of those ten lawsuits were orchestrated by Shein.  Notably, five of these lawsuits were initiated by Shein's affiliated merchants within days after Temu first brought the antitrust lawsuit against Shein.  Shein's exclusionary litigation campaign is particularly offensive because Shein itself is a serial infringer.  Shein does not take IP rights seriously and in fact has been the subject of a number of lawsuits.  Shein itself has been named as a defendant in more than 90 IP infringement cases by over 80 rights holders and independent artists.

120.    Shein's own conduct confirms that its campaign of accusing Temu of copyright infringement has nothing to do with protecting valid IP rights.  The DMCA requires that notices of claimed infringement must include information sufficient to evaluate the claim asserted in the notice.  Shein's DMCA notices to Temu display a flagrant disregard for these requirements. For example, in September 2022, Shein sent Temu 472 DMCA notices, referring to 448 different links to distinct Shein products, all directed at a single product (a handbag) on Temu's marketplace.  However, many of the links sent by Shein (*i.e.*, the alleged bases of Shein's infringement claim) pointed to completely unrelated products, such as women's dresses, violating the DMCA—and therefore further perpetuating Shein's anticompetitive Scheme through abusive, sham infringement claims.

121.    Similarly, since February 14, 2023, Shein has stopped providing clickable links in the voluminous takedown notices it has sent to Temu.  Instead, it sends Temu notices in a

non-searchable PDF format or with broken and unusable Internet links that make it impossible to locate the accused material.  Between February 14, 2023 and June 6, 2023, Shein filed takedown requests affecting 19,850 listings in only PDF format without clickable links.  In another communication sent from Shein to Temu on May 15, 2023, containing 1,490 takedown notices, Shein provided Temu with only one image link to demand the takedown of over 562 different product listings.

122.    Shein has bombarded Temu with scores of non-compliant and unusable DMCA takedown notices to delay Temu's response times and disrupt its business.  In fact, Shein purposefully packages its takedown notices to Temu in large packets, so that a significant volume of takedown notices are provided in spikes over a small period of time to make it difficult for Temu to appropriately address them.  This behavior underscores that Shein's true intention is not to have Temu take down allegedly infringing products, but to cause disruption to Temu's business by making it difficult for Temu to identify and remove allegedly at-issue content.

123.    The significant volume of takedown notices in unclickable format that Temu has received from Shein also means that there is no opportunity for Temu adequately to assess the merits of these takedown notices before taking down the listings—precisely the result that Shein intended.  In fact, Shein has asserted more takedown requests against Temu than the rest of the rights holders in the world combined.

124.    Shein has singled out Temu with copyright infringement notices while overlooking similar activities on other platforms.  This selective "enforcement" makes it evident that Shein's primary objective is to disrupt Temu's business.  This also highlights Shein's aim to solidify its monopoly in ultra-fast fashion.

125.    Shein's malicious takedown notices, containing large volumes of allegedly infringing images, also are intended to disrupt Temu's relationships with suppliers and prevent

them from dealing further with Temu.  Several suppliers have filed lawsuits against Shein in China, claiming that Shein infringes the suppliers' own IP rights and that Shein forces Temu to take down these suppliers' products based on Shein's falsely claimed IP rights.  Shein's conduct has resulted in the suppliers' products being taken down from Temu and has therefore led to significant business losses to such suppliers.  When the takedowns resulted in the suppliers' products being unlisted during the peak of the summer sales season, this was especially harmful to the businesses of the suppliers.

126.    Further evidence of Shein's anticompetitive intent is that Shein's takedown notices primarily have targeted the products offered on the Temu platform that are more affordable than identical or similar products listed on Shein's website.

### 2.    Shein Has Forced Suppliers to Transfer Away Their IP Rights and Then Improperly Used Those Rights to Exclude Competition from Temu

127.    In the takedown notices that it has served on Temu's agent, Shein has made the following false statement:  "I hereby state that I have a good faith belief that the disputed use of the copyrighted material identified above is not authorized by the copyright owner, its exclusive licensee, its agent or under the law."

128.    But to the extent any IP asserted against Temu is derived from the Exclusive-Dealing Agreements Shein has coerced its suppliers into signing, these Agreements do not create effective assignments or valid exclusive licenses to the suppliers' copyrights.  As discussed above, many of the "licenses" that Shein obtained from suppliers were obtained through deceptive and coercive practices, where the suppliers were not aware of the transfer of IP rights for any products the supplier elected to list on Shein's website, and where the suppliers transferred their IP rights to Shein for no consideration.  The Shein Exclusive-Dealing Agreements are unenforceable contracts of adhesion.  Upon information and belief, Shein has not executed separate assignments with the suppliers other than the Exclusive-Dealing

35

Agreements providing for the transfer of the suppliers' copyrights.

129.    Contrary to Shein's repeated false assertions that Shein has "a good faith belief that the disputed use of the copyrighted material identified above is not authorized by the copyright owner," in many instances the use of photos or videos by manufacturers on the Temu platform is in fact authorized by the copyright owners, because the true creators and lawful copyright owners of the product display images are the suppliers.

### 3.    This Antitrust Litigation Addresses a Separate Set of Conduct than the Illinois Copyright Infringement Litigation That Shein Has Mischaracterized in This Court

130.    Shein's recent reference in this Court to an Illinois court's TRO against Temu is only further evidence that Shein intends to continue using improperly-obtained IP to pursue sham infringement litigation and eliminate competition.  After Temu had the opportunity to present the court in Illinois with evidence of Shein's misrepresentations in asserting its infringement claims—and evidence that counters Shein's likelihood of success on the merits of its claims—the court granted Temu's request to postpone the proceedings on Shein's request for a preliminary injunction and granted Temu's request for expedited discovery.  Accordingly, the Illinois litigation does not validate Shein's anticompetitive Scheme to exclude competition from Temu and to entrench its dominant position under the guise of IP enforcement.

131.    For example, Temu has discovered that, of the 35 registrations identified in Shein's copyright complaint alone, at least 30 (85%) contain misrepresentations that may be cause for invalidation.  In one registration, Shein falsely represented to the Copyright Office that the photographs that suppliers provided to Shein, at the suppliers' expense, are "works for hire."  These notices also involve Shein's registrations for 11 groups of photographs and 7 individual works as unpublished, even though Shein knew that some in fact had been published on its websites.  In other registrations, Shein's records show that the publication or creation dates on the registrations are wrong.  Shein made misrepresentations with respect to 21

copyright registrations by misstating the date on which written transfer agreements were executed in order to claim ownership to copyrights. These material inaccuracies are grounds for the Register to refuse registration and are evidence of Shein's anticompetitive Scheme to exclude competition from Temu.

132.    Accordingly, nothing in the Illinois litigation supports the validity of Shein's anticompetitive Scheme to exclude competition from Temu and to entrench its dominant position under the guise of IP enforcement.

**IV.    Shein's Multi-Faceted Anticompetitive Scheme Has Foreclosed Temu from Competing in the U.S. Market**

133.    Shein's coercive and anticompetitive conduct has foreclosed Temu from access to approximately 70–80% of ultra-fast fashion suppliers. Given the remaining 20–30% of suppliers are long-tail, small-scale operations, Temu and other ultra-fast fashion competitors effectively have access to only about 10–20% of the industry's manufacturing capacity. As a result, Shein's conduct cripples Temu's ability to compete with Shein in the U.S. market.

134.    In ultra-fast fashion, it is the suppliers that design the clothing and create the advertising content (*i.e.*, photographs, images, and videos). Yet Shein's Exclusive-Dealing Agreements with suppliers purport to grant all rights to "use" the "styles" of suppliers' products exclusively to Shein and transfer to Shein all IP rights in the images, pictures, and videos of the products. These terms make it uneconomical and, as a practical matter, impossible for those suppliers to sell their apparel on the Temu platform. Indeed, many suppliers have systematically removed from Temu all of the products that they used to sell on both platforms and refused to offer new products on Temu. For instance, a supplier with 500,000–600,000 ultra-fast fashion unit sales per month uploaded over 200 SKUs on Temu since October 2022, but was forced to stop doing business with Temu in early 2023 as a direct result of Shein's exclusivity demands, as well as its threats and intimidation.

135.    To compete in ultra-fast fashion, Temu must have access to suppliers that are

capable of shifting production to new SKUs immediately and matching ever-evolving customer demand in real time, as opposed to relying on a high volume of a single production run or SKU. Unfortunately, the combination of creating a high volume of SKUs and different product styles on razor-thin margins makes these unique suppliers especially susceptible to coercion by Shein because such suppliers must constantly introduce new, low-priced products to stay competitive. Rather than offering these suppliers better terms, Shein has resorted to threats, intimidation, and explicit and *de facto* exclusive relationships to cut off Temu's access to approximately 70–80% of these specialized suppliers.

136.    Temu cannot compete against Shein in the U.S. with access to only 10–20% of the overall capacity of ultra-fast fashion suppliers.  Temu has made significant investments, and incurred substantial costs, to enter the U.S. ultra-fast fashion market.  Shein's conduct is unfairly limiting Temu's sales volume and artificially raising its costs, reducing Temu's ability to achieve the economies of scale needed to grow and compete.  Without the ability to contract with these suppliers, Temu's growth in the ultra-fast fashion market is being unfairly constrained, while Shein continues to further entrench its monopoly position.  But for Shein's anticompetitive conduct and unreasonable agreements, Temu could sell as much as three to four times the daily volume of ultra-fast fashion merchandise that it currently sells by competing head-to-head with Shein on price, quality, and speed—a fight Shein knows Temu can win.

## V.    Shein's Multi-Faceted Anticompetitive Scheme Has Harmed Consumers, Suppliers, and Competition as a Whole by Increasing Prices, Reducing Quality, and Limiting Consumer Choice

137.    The consequences of Shein's coercive and anticompetitive conduct are not limited to Temu and other retailers—consumers and suppliers are suffering, as well.

138.    Shein is robbing *consumers* of the benefits of direct competition between Shein and Temu, eliminating the ability to comparison shop for the same or similar products across

Temu and Shein's platforms. Temu regularly beats Shein on price for identical products, and consumers benefit from lower average costs across platforms when suppliers are permitted to sell on both Temu and Shein. Yet Shein's anticompetitive Exclusive-Dealing Agreements with suppliers stamp out that competition before it even starts, driving up prices, limiting selection, reducing product quality, and undermining the competitive process.

139.    Suppliers also bear the brunt of Shein's conduct. Shein's permanent seizure of suppliers' IP rights—in not only the products offered on Shein's website but also the "related styles"—means that suppliers cannot use any such IP rights to develop new products. Suppliers have alleged that Shein has even gone so far as to make false claims of IP ownership that have resulted in products improperly being removed from the Temu platform. Indeed, several suppliers have filed suits against Shein in China, claiming that Shein infringes their IP rights and improperly forces Temu to remove products based on falsely claimed IP rights.

140.    Given Shein's conduct, it is hardly surprising that suppliers live in fear of Shein, constrained by threats from Shein, and often refuse to work with Temu given the risk of retaliation. One supplier reported being "worried because we also have an agreement with Shein," noting that "if Shein sues [them], it'll be very embarrassing." Another supplier wrote to Temu to explain its decision to take down its Temu postings: "Shein is going to pursue liability and give us a fine [of RMB] 100,000" (approximately $15,000).

141.    There is constant pressure on these suppliers—many of which are small businesses with limited resources—for lower prices, higher churn, and faster design. With razor-thin margins, these suppliers would prefer to sell on as many platforms as possible. Shein's restrictions and intimidation make this virtually impossible, narrowing the outlets to which these manufacturers can sell. Shein's threats, lawsuits, and fines bring more than just embarrassment for these suppliers—Shein's conduct jeopardizes their entire business model.

142.    Without Shein's explicit and *de facto* exclusive relationships, and threats of

fines and penalties, suppliers would have every reason to sell on both the Temu and Shein platforms, expanding their customer base, generating more revenue, and growing their business by leveraging the same product design and imagery used for one platform on the other. As one supplier explained, "98% of [the] products are Shein top selling items" that it tries "to give to [Temu] at the same time." Moreover, on information and belief, suppliers' prices are lower, and overall sales volume is higher, when suppliers sell their products on multiple platforms simultaneously. By forcing suppliers to forego selling on the Temu platform, Shein improperly restricts supplier growth, reach, and profitability.

## **CLAIMS**

### **CLAIM I**
### **(MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2)**

143.    Temu incorporates the allegations of paragraphs 1 through 142 as if fully set forth herein.

144.    Shein possesses monopoly power in the relevant market.

145.    Shein has willfully maintained that power by engaging in the anticompetitive and exclusionary Scheme alleged herein.

146.    Shein's maintenance of its monopoly power is not a consequence of a superior product, business acumen, or historical accident.

147.    There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

148.    Shein's Scheme, and each of the constituent acts in that Scheme, constitute a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

149.    Shein's anticompetitive conduct has affected a substantial portion of interstate commerce.

150.    Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of the antitrust laws in these circumstances. Consumers will also

suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

151.    Shein's anticompetitive conduct has caused Temu actual damages.

152.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM II
## (ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2
## OF THE SHERMAN ACT, 15 U.S.C. § 2)

153.    Temu incorporates the allegations of paragraphs 1 through 142 as if fully set forth herein.

154.    Shein has attempted, continues to attempt, and specifically intends to monopolize the relevant market by engaging in the anticompetitive and exclusionary Scheme alleged herein.

155.    Shein possesses sufficient power in the relevant market such that it has a dangerous probability of success of monopolizing the relevant market.

156.    There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

157.    Shein's Scheme, and each of the constituent acts in that Scheme, constitutes an attempt violation under Section 2 of the Sherman Act, 15 U.S.C. § 2.

158.    Shein's anticompetitive conduct has affected a substantial portion of interstate commerce.

159.    Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

160.    Shein's anticompetitive conduct has caused Temu actual damages.

161.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

**CLAIM III**
**(VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14)**

162.    Temu incorporates the allegations of paragraphs 1 through 142 as if fully set forth herein.

163.    Shein possesses sufficient market power in the relevant market such that its Scheme has substantially lessened competition or tended to create a monopoly in the relevant market.

164.    Shein's Scheme and its constituent acts, including specifically its Exclusive-Dealing Agreements and Loyalty Attestations, constitute anticompetitive exclusive dealing in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

165.    There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

166.    Shein's anticompetitive conduct has affected a substantial portion of interstate commerce.

167.    Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

168.    Shein's anticompetitive conduct has caused Temu actual damages.

169.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM IV
## (VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1)

170.    Temu incorporates the allegations of paragraphs 1 through 142 as if fully set forth herein.

171.    Shein's Exclusive-Dealing Agreements and Loyalty Attestations are coerced agreements that Shein forces on suppliers, are anticompetitive, and unreasonably restrain trade in the relevant market.

172.    Shein's anticompetitive conduct, including its Exclusive-Dealing Agreements, has affected a substantial portion of interstate commerce.

173.    Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

174.    Shein's anticompetitive conduct has caused Temu actual damages.

175.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM V
## (CHAPTER 93A OF THE MASSACHUSETTS GENERAL LAWS)

176.    Temu incorporates the allegations of paragraphs 1 through 142 as if fully set forth herein.

177.    Shein's conduct is knowingly and willfully directed to harm Temu, the U.S. headquarters of which is based in Massachusetts.

178.    Shein's conduct was, among other things, an antitrust violation based on unlawful agreements in restraint of trade, monopolization or attempted monopolization, and exclusive dealing in violation of the United States Code as set forth above.  For these reasons,

among others, Shein's conduct was knowingly unfair and deceptive, injurious to the public, and an unfair method of competition in violation of Chapter 93A.

179.    Shein's unfair and illegal conduct caused actual damage to Temu in the form of lost sales and profits.

180.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM VI
## (TORTIOUS INTERFERENCE WITH CONTRACT)

181.    Temu incorporates the allegations of paragraphs 1 through 142 as if fully set forth herein.

182.    Temu has existing contracts with ultra-fast fashion manufacturers, including specifically those manufacturers who stopped doing business with Temu as alleged above. Each of these contracts affords Temu existing or prospective legal rights.

183.    Shein wrongfully, and without justification or privilege, intentionally interfered with Temu's aforementioned existing contracts through anticompetitive, wrongful, and unjustifiable means of interference in order to disrupt Temu's business and gain an unfair and unjustified advantage over Temu.

184.    At the time of its actions, Shein had actual knowledge of the relevant contracts.

185.    Shein's conduct has caused, and will cause, actual damage to Temu.

186.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## CLAIM VII
## (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS)

187.    Temu incorporates the allegations of paragraphs 1 through 142 as if fully set forth herein.

188.    Temu has existing or prospective business relations with ultra-fast fashion manufacturers, including specifically those manufacturers who stopped doing business with Temu as alleged above.

189.    Shein wrongfully, and without justification or privilege, intentionally interfered with Temu's existing contracts and prospective business through the anticompetitive, wrongful, and unjustifiable means of interference alleged herein.

190.    At the time of its actions, Shein had actual knowledge of the relevant prospective business relationships.

191.    Shein cannot justify its actions as legitimate competition.

192.    Shein's conduct has caused, and will cause, actual damage to Temu.

193.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## PRAYER FOR RELIEF

194.    WHEREFORE, Temu respectfully requests relief and judgment as follows:

(a)     declaring, ordering, and adjudging that the conduct challenged herein unreasonably restrained trade, monopolized or attempted to monopolize the relevant market, or otherwise violated the Sherman and/or Clayton Antitrust Acts and, further, that it was illegal and tortious under Massachusetts state law;

(b)     permanently enjoining Shein (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the Exclusive-Dealing Agreements and Loyalty Attestations and/or any other any other similar agreements or

arrangements that Shein obtained by virtue of the conduct challenged herein;

(c)  awarding Temu its full monetary damages to be proven at trial;

(d)  awarding Temu treble monetary damages, pursuant to 15 U.S.C. § 15;

(e)  awarding Temu pre-and post-judgment interest on its damages;

(f)  awarding Temu treble, double, or actual monetary damages pursuant to Chapter 93A, Section 11 of the Massachusetts General Laws;

(g)  awarding Temu the costs of this action and attorneys' fees pursuant to 15 U.S.C. § 15 and Chapter 93A, Section 11 of the Massachusetts General Laws; and

(h)  awarding Temu such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38, Temu hereby demands a trial by jury on all issues so triable.

Date:  October 2, 2023                    Respectfully submitted,

*/s/ Kevin C. Adam*
Kevin C. Adam (BBO #684955)
WHITE & CASE LLP
24th Floor
75 State Street
Boston, MA 02109
Telephone: (978) 836-6363
kevin.adam@whitecase.com

Jack E. Pace III (*pro hac vice* pending)
Holly Tao (*pro hac vice* pending)
Zhengping Lu (*pro hac vice* pending)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020

Telephone: (212) 819-8520
Fax: (212) 354-8113
jpace@whitecase.com
holly.tao@whitecase.com
zhengping.lu@whitecase.com

J. Mark Gidley (*pro hac vice* pending)
WHITE & CASE LLP
Washington, DC 20005
New York, NY 10036
Telephone: (202) 626-3609
Fax: (202) 639-9355
mgidley@whitecase.com

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO# 215620)
One Boston Place, Suite 2600
Boston, MA 02108
(617) 439-3939
(617) 439-0134
ehaber@shulaw.com

BOIES SCHIILLER FLEXNER LLP
Philip C. Korologos
(*admitted pro hac vice*)
55 Hudson Yards
20th Floor
New York, NY 10001
(212) 446-2300
(212) 446-2350 (fax)
pkorologos@bsfllp.com

James P. Denvir
(*admitted pro hac vice*)
1401 New York Ave, NW
Washington, DC 20005
(202) 237-2727
(202) 237-6131 (fax)
jdenvir@bsfllp.com

Sean P. Rodriguez
(*admitted pro hac vice*)
44 Montgomery Street
41st Floor
San Francisco, CA 94104
(415) 293-6800
(415) 293-6899 (fax)
srodriguez@bsfllp.com

*Counsel for Plaintiff Whaleco Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document will be filed through the ECF system, providing notice to all counsel of record.

Dated: October 2, 2023

_/s/ Kevin C. Adam_
Kevin C. Adam